TURNPIKE REALTY COMPANY, INC. *vs.* TOWN OF DEDHAM.

Norfolk. April 6, 1972. — June 26, 1972.

Present: TAURO, C.J., SPIEGEL, BRAUCHER, & HENNESSEY, JJ.

*Zoning*, Flood plain zoning, Wetlands, Special permit, Validity. *Constitutional Law*, Zoning, Due process of law, Eminent domain, Police power. *Eminent Domain*, What constitutes taking.

The validity of a zoning by-law establishing a flood plain district did not hinge upon the motives of its supporters, where the reasons for the creation of the district were clearly set forth in the by-law itself. [226]

In a proceeding challenging the validity of a zoning by-law which established a flood plain district, the trial judge was correct in denying the petitioner's request for rulings that "[t]he word 'flooding' in the enabling statute [G. L. c. 40A, § 2] means flooding from

natural causes" and that "[t]he enabling statute does not authorize the inclusion of lands in a Flood Plain district which are not subject to seasonal or periodic flooding from natural causes." [226–227]

A flood plain zoning by-law whose stated purposes were "to preserve and maintain the ground water table; to protect the public health and safety, persons and property against the hazards of flood water inundation; for the protection of the community against the costs which may be incurred when unsuitable development occurs in swamps, marshes, along water courses, or in areas subject to floods; and to conserve natural conditions, wild life, and open spaces for the education, recreation and general welfare of the public, was validly enacted under the general grant of authority in G. L. c. 40A, §§ 2, 3 [227–229]; the last sentence of G. L. c. 40A, § 2, does not in any way limit the authority of a municipality to enact a flood plain zoning by-law [227–228]; since the by-law was fully supported by valid considerations of public welfare in the first three stated purposes, the fourth, aesthetic, purpose of conserving "natural conditions, wild life, and open spaces" did not bring it into conflict with the enabling act [229].

Where, in a flood plain zoning by-law, one of three provisions limited the uses of land in the flood plain district and authorized special permits for buildings "accessory to any of the Flood Plain uses," a second provision contained specific considerations for the board of appeals in entertaining applications for construction of accessory buildings, and a third provision authorized special permits for broad uses of land "not subject to flooding or not unsuitable because of drainage conditions," the three provisions established two independent special permit procedures which were not in conflict [229–231]; a phrase "Except as provided above" in a fourth provision, denying the right to fill, build, or permanently store materials or equipment, referred to the two types of special permits set out in the other three provisions [231].

Where a flood plain zoning by-law provided that before the board of appeals granted a special permit for any of certain uses of land in the flood plain district, it must be proved "to the satisfaction of the" board that the land was not subject to flooding or not unsuitable because of drainage conditions for the particular use, and that such use would not interfere with the general purposes of the flood plain district and would not be detrimental to the "public health, safety, or welfare," such provision of the by-law and the right of judicial review under G. L. c. 40A, § 21, together provided adequate standards for the guidance of the board [231–232]; the possibility that a special permit granted to a landowner might be contested in court and annulled did not render the by-law invalid [232].

Where it appeared that there was a reasonable basis for a judgment by a town meeting that land was subject to seasonal or periodic flooding, a flood plain zoning by-law which placed the land in a flood plain district within which no buildings could be erected and no premises could be used except for "woodland, grassland, wetland, agricultural, horticultural, or recreational use of land or water not requiring filling" and except for certain other uses on special permits from the board of appeals, was constitutional, even

though there was a "substantial diminution" in the value of the land. [233–237] TAURO, C.J., concurring.

In a proceeding challenging the validity of a flood plain zoning by-law, there was no error in a ruling that two knolls on the petitioner's land were included in the flood plain district and were subject to the by-law. [237]

In a proceeding challenging the validity of a flood plain zoning by-law as applied to certain land, there was no error in a ruling that the respondent town "acted reasonably when . . . it impliedly 'deemed' the . . . [land] to be subject to 'seasonal' or 'periodic' flooding," and no express findings by the town meeting were required. [237–238]

PETITION filed in the Land Court on October 6, 1966.

The case was heard by *Silverio*, J.

*Antonino F. Iovino* for the petitioner.

*Herbert P. Wilkins* (*Acheson H. Callaghan, Jr. & Jeffrey Swope* with him) for the respondent.

*John A. Perkins*, Town Counsel, joined in a brief.

SPIEGEL, J. The petitioner, the owner of 61.9 acres of land in Dedham, brought this petition in the Land Court under the provisions of G. L. c. 185, § 1 (j½), and c. 240, § 14A, to determine, inter alia, the validity of an amendment to a zoning by-law as applied to the land of the petitioner. The judge in his decision ruled that the by-law "was a valid exercise of the authority and powers conferred upon the respondent . . . by . . . [G. L. c.] 40A and is in full force and effect as to the petitioner's land." The case is here on the petitioner's exceptions to several of the judge's findings and to his denial of a number of the petitioner's requests for rulings.

The petitioner acquired the land in question in 1947. It is made up of uplands and lowlands and includes two knolls, one of 3.2 acres and the other of .2 acres, which rise above the elevation of the petitioner's lowland. The land is bounded by Route 1, the Boston-Dedham boundary line, the Charles River, and the Mother Brook. At the annual town meeting in 1963 the respondent amended its "zoning by-laws and [z]oning [m]ap by adopting a zoning by-law establishing a "Flood Plain

District," which included "the land of the petitioner, except for a minor portion thereof." Prior to the amendment the entire area involved in this case was in a general residence zoning district. The judge found that the knolls were included in the flood plain district. The remaining land of the petitioner is "a low swampy area" bordering on the Charles River.

Pertinent portions of the by-law, with paragraph numbers added by us for clarity of reference, are as follows: "[1] The purpose of the Flood Plain District is to preserve and maintain the ground water table; to protect the public health and safety, persons and property against the hazards of flood water inundation; for the protection of the community against the costs which may be incurred when unsuitable development occurs in swamps, marshes, along water courses, or in areas subject to floods; and to conserve natural conditions, wild life, and open spaces for the education, recreation and general welfare of the public. [2] Within a Flood Plain District no structure or building shall be erected, altered or used, and no premises shall be used except for one or more of the following uses: Any woodland, grassland, wetland, agricultural, horticultural, or recreational use of land or water not requiring filling. Buildings and sheds accessory to any of the Flood Plain uses are permitted on approval of the Board of Appeals. Notice of each such Flood Plain building permit application shall be given to the Town Public Works Department, to the Town Board of Health, to the Town Planning Board, and to the Town Conservation Commission as well as all other parties required. [3] The Board of Appeals, in hearing such application, shall consider, in addition to any other factors said Board deems pertinent, the following aspects with respect to flooding and Flood Plain District zoning provisions: that any such building or structure shall be designed, placed, and constructed to offer a minimum obstruction to the flow of water; and that it shall be firmly anchored to prevent floating away. [4] If any land in the Flood Plain district is proven to the

satisfaction of the Board of Appeals after the question has been referred to the Planning Board, the Board of Health, and the Board of Selectmen, and reported on by all three boards or the lapse of thirty days from the date of referral without a report, as being in fact not subject to flooding or not unsuitable because of drainage conditions for any use which would otherwise be permitted if such land were not, by operation of this section, in the Flood Plain district, and that the use of such land for any such use will not interfere with the general purposes for which Flood Plain districts have been established, and will not be detrimental to the public health, safety, or welfare, the Board of Appeals may, after a public hearing with due notice, issue a permit for any such use. [5] Except as provided above, there shall be in the Flood Plain District: No land fill or dumping in any part of the District. No drainage other than Flood Control works by an authorized public agency. No damming or relocation of any water course except as part of an over-all drainage basin plan. No building or structure. No permanent storage of materials or equipment. [6] In any Flood Plain District after the adoption of this provision, no land, building, or structure shall be used for sustained human occupancy except dwellings theretofore lawfully existing, or land, buildings or structures which comply with the provisions of this by-law."

The petitioner attacks the validity of the by-law on several grounds. Many of its arguments overlap. We treat its central contentions as it has presented them in its brief.

1. A recurrent argument throughout the petitioner's brief is that the prime purpose of the by-law was to "retain . . . [its] land in its natural state and as a flood water detention basin." It appears to rely to a considerable extent on various statements made by members of the Dedham conservation commission which suggest that their primary interest in urging the adoption of the by-law was for the above reasons. This

demonstrates, it argues, that the by-law was "not regulatory, but confiscatory."

The validity of this by-law does not hinge upon the motives of its supporters. See *Caires* v. *Building Commr. of Hingham,* 323 Mass. 589, 596. The reasons for the creation of the flood plain district are clearly set forth in the by-law itself. There is no need to speculate about the "prime purpose" of the by-law. Whether the stated purposes are within the authority granted by the Zoning Enabling Act, G. L. c. 40A, is a question which we will consider in the course of this opinion.

2. The petitioner takes the position that lands which are not subject to flooding from "natural" causes cannot or should not be included in a flood plain district, and that the judge's rulings denying the petitioner's requests on this point were erroneous.[1] It admits that its land was on occasions "covered with water" because of the overflow from the Charles River but charges this is mismanagement of the Mother Brook bascule gate[2] by one Salvatore Trementozzi, an employee of the Metropolitan District Commission. The petitioner seeks to characterize this flooding as "artificial."

The Mother Brook bascule gate was completed in 1959 as part of flood control work on the Charles River to reduce the effect of flooding. Trementozzi testified that when the gate is lowered, water is diverted into Mother Brook; when it is raised, water remains in the Charles River. He also testified that he made the decision "on a regular basis" whether to raise or lower the gate. On certain dates when the petitioner's land was flooded, Trementozzi decided not to lower the gate. The petitioner argues that the flooding over its land could have

---

[1] These requests were: "7. The word 'flooding' in the enabling statute . . . means flooding from natural causes. . . . 11. The enabling statute does not authorize the inclusion of lands in a Flood Plain district which are not subject to seasonal or periodic flooding from natural causes."

[2] Webster's Third New Intl. Dictionary defines "bascule" as follows: "[A]n apparatus or structure in which one end is counterbalanced by the other on the principle of the seesaw or by weights."

been prevented by "proper" operation of the gate. The evidence, however, in no way suggests that Trementozzi's management of the gate was unreasonable, or that "the locus was . . . an area which was being utilized by Trementozzi, at the expense of the petitioner, for public purposes."

Although the judge did not make explicit findings of fact on this point, it is clear that he considered the petitioner's contention. In any event, we are of opinion that the judge was correct in denying the petitioner's requests for rulings on this issue.

3. The petitioner argues that "the enactment of the by-law was arbitrary, capricious and unreasonable and went beyond the authority granted in the last sentence of" c. 40A, § 2, which reads as follows: "A zoning . . . by-law may provide that lands deemed subject to seasonal or periodic flooding shall not be used for residence or other purposes in such a maner as to endanger the health or safety of the occupants thereof."

The preamble of the by-law sets out its purposes: (numbers added for clarity of reference) "[1] to preserve and maintain the ground water table; [2] to protect the public health and safety, persons and property against the hazards of flood water inundation; [3] for the protection of the community against the costs which may be incurred when unsuitable development occurs in swamps, marshes, along water courses, or in areas subject to floods; [4] and to conserve natural conditions, wild life, and open spaces for the education, recreation and general welfare of the public."

We first state our view that the last sentence of G. L. c. 40A, § 2, does not in any way limit the authority of a municipality to enact a flood plain zoning by-law. Even before the last sentence became part of the enabling act,[3] we believe that a municipality could validly have enacted a flood plain zoning by-law under the general grant of authority in G. L. c. 40A, § 2 (to pro-

---

[3] The sentence was added by St. 1954, c. 368, § 2, as part of a general revision of the Zoning Enabling Act.

mote the "health, safety, convenience, morals or wel-
fare"), and for the reasons set forth in G. L. c. 40A,
§ 3 ("to secure safety from fire, panic and other dan-
gers"). See Dunham, Flood Control Via the Police
Power, 107 U. of Pa. L. Rev. 1098, 1118–1121. Although
it might be argued that such authority to enact flood
plain zoning could not be implied before the insertion
of the last sentence of G. L. c. 40A, § 2, and that we
must therefore regard the objective of such flood plain
zoning as limited to the protection of "occupants" of
residences on land subject to flooding, we think it "just
as logical to regard . . . [the last sentence of G. L.
c. 40A, § 2] as a clarification of an ambiguity and a
legislative interpretation of the original act." See *Fitz-
Inn Auto Parks, Inc.* v. *Commissioner of Labor &
Indus.* 350 Mass. 39, 42. We believe that the test gov-
erning the validity of a flood plain zoning by-law or
ordinance is the same as that governing any other zoning
by-law or ordinance. "The test is whether there has
been shown any substantial relation between the amend-
ment and the furtherance of any of the general objects
of the enabling act. *Caires* v. *Building Commr. of
Hingham,* 323 Mass. 589, 593. *Lamarre* v. *Commis-
sioner of Pub. Works of Fall River,* 324 Mass. 542, 545.
The promotion of the public welfare, as that term is
fairly broadly construed, is chief among the purposes
of the enabling statute." *Lanner* v. *Board of Appeal
of Tewksbury,* 348 Mass. 220, 228.

More specifically, three basic public policy objectives
of restricting use of flood plains have been advanced: (1)
the protection of individuals who might choose, despite
the flood dangers, to develop or occupy land on a flood
plain; (2) the protection of other landowners from dam-
ages resulting from the development of a flood plain and
the consequent obstruction of the flood flow; (3) the pro-
tection of the entire community from individual choices
of land use which require subsequent public expenditures
for public works and disaster relief. See Dunham, Flood

Control Via the Police Power, 107 U. of Pa. L. Rev. 1098, 1110–1117.

The first three stated purposes of the by-law are consistent with these objectives.[4] The fourth purpose would fall into the category of "[a]esthetic considerations." *Barney & Carey Co.* v. *Milton*, 324 Mass. 440, 448. In the *Barney & Carey* case, we said: "Aesthetic considerations may not be disregarded in determining the validity of a zoning by-law, but they do not alone justify restrictions upon private property merely for the purpose of preserving the beauty of a neighborhood or town." Furthermore, we said: "Regard for the preservation of the natural beauty of a neighborhood makes the enactment of a zoning regulation desirable but does not itself give vitality to the regulation." Since the by-law is fully supported by other valid considerations of public welfare, the additional purpose of conserving "natural conditions, wild life, and open spaces" does not bring it into conflict with the enabling act.

The petitioner asserts that several other portions of the by-law are unreasonable and unduly burdensome. We do not agree. Paragraph 2 limits the uses of land in a flood plain district: "Within a Flood Plain District no structure or building shall be erected, altered or used, and no premises shall be used except for one or more of the following uses: Any woodland, grassland, wetland, agricultural, horticultural, or recreational use of land or water not requiring filling. Buildings and sheds accessory to any of the Flood Plain uses are permitted on approval of the Board of Appeals." Paragraph 3 contains specific considerations for the board of appeals in entertaining applications for construction of "accessory" buildings: i.e., "that any such building or structure shall be designed, placed, and constructed to offer a minimum obstruction to the flow of water; and that it shall be

---

[4] It appears that the first purpose, preserving and maintaining the ground water table, is related to preventing depletion of the water supply.

firmly anchored to prevent floating away." Paragraph 4 contains a separate and much broader exception than the "accessory" building exception of paragraph 2: "If any land in the Flood Plain district is proven to the satisfaction of the Board of Appeals after the question has been referred to the Planning Board, the Board of Health, and the Board of Selectmen, and reported on by all three boards or the lapse of thirty days from the date of referral without a report, as being in fact not subject to flooding or not unsuitable because of drainage conditions for any use which would otherwise be permitted if such land were not, by operation of this section, in the Flood Plain district, and that the use of such land for any such use will not interfere with the general purposes for which Flood Plain districts have been established, and will not be detrimental to the public health, safety, or welfare, the Board of Appeals may, after a public hearing with due notice, issue a permit for any such use." The petitioner asserts that these three paragraphs are conflicting. It contends that the board of appeals would be without authority to grant a permit for an "accessory" building (paragraph 2) "for it must be proven, under paragraph 4, to its 'satisfaction' that the land is not subject to flooding; and, therefore, any provision that a building provide a minimum obstruction to the flow of water or be anchored to prevent its floating away (as in paragraph 3) is in conflict with paragraph 4." Similarly, it claims, the board could not grant a permit under paragraph 4 for any "use which would otherwise be permitted if such land were not . . . in the Flood Plain district" if such use does not meet the requirements of paragraph 3, or is contrary to the uses permitted in paragraph 2.

The judge correctly reconciled paragraphs 2 through 4 by distinguishing between the special permit procedure applicable to "accessory" buildings, and the special permit procedure relating to land "not subject to flooding or not unsuitable because of drainage conditions." The two procedures are independent. Restrictions concerning the water flow and anchoring make sense only when related

to "accessory" buildings. Paragraph 4, by contrast, was intended to prevent injustice resulting from the establishment of zoning districts based on "the physical characteristics of substantial areas." *Leahy* v. *Inspector of Bldgs. of New Bedford*, 308 Mass. 128, 132. An example of the type of situation where a landowner might resort to the procedure under paragraph 4 would be the two "knolls" on the petitioner's land which rise above the general level of the swamp.

4. The petitioner contends that several aspects of the by-law are vague and ambiguous. It argues that the phrase "Except as provided above" in paragraph 5 (which, inter alia, denies the right to fill, build, or permanently store materials or equipment) could refer to any of the four previous paragraphs. We think it clearly refers to the two types of special permits set out in paragraphs 2, 3 and 4. For instance, if the petitioner were granted a special permit to build an "accessory" building, paragraph 5 would not prevent it from filling its land for this purpose.

The petitioner particularly objects to the phrase "to the satisfaction of the Board of Appeals" in paragraph 4. It argues that there is no standard to measure "satisfaction" and thus an owner is subject to the "caprice and whim of men." As we have recently stated in the case of *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 637–638: "The delegation of authority to the board of appeals to act on applications for special permits for exceptions to the zoning by-law cannot leave the decision subject to the 'untrammeled discretion' or 'unbridled fiat' of the board. . . . The Zoning Enabling Act and the by-law together must provide adequate standards for the guidance of the board in deciding whether to grant or to withhold special permits . . . . The standards need not be of such a detailed nature that they eliminate entirely the element of discretion from the board's decision." In the *MacGibbon* case, we concluded that sufficient standards for the board of appeals were contained in G. L. c. 40A, § 4, and § 8 (d) of the Duxbury by-law, which provided

that: "[t]he Board of Appeals may, in appropriate cases
and subject to appropriate conditions and safeguards,
make special exceptions to the terms of the by-law in
harmony with their general purpose and intent, and in
accordance with the specified rules contained in this
by-law." In the instant case, the standards to be applied
by the board are at least as precise. The board must find
that the land is not subject to flooding or not unsuitable
because of drainage conditions for a particular use; and
that such use will not interfere with the general purposes
of the flood plain district, and will not be detrimental to
the "public health, safety, or welfare." Moreover, the
decision of the board is subject to judicial review under
G. L. c. 40A, § 21, and, as in the *MacGibbon* case, may
be reversed if it is "based on a legally untenable ground,
or is unreasonable, whimsical, capricious or arbitrary."
P. 639.

5. The petitioner further maintains that the special
permit procedure is valueless because no permit under
paragraph 4 for any use permitted by the underlying
general residence zone could validly be granted because
it would not be "in harmony with the general purpose
and intent of the . . . by-law." G. L. c. 40A, § 4. If
such permit were granted, the petitioner states, it would
be "subject to annulment by action taken under [G. L.]
c. 40A, § 16, by persons aggrieved or by mandamus
proceedings."

The possibility that a special permit granted to a land-
owner would be contested in court and annulled does not
render the by-law invalid. Moreover, in order for a
special permit to be granted under paragraph 4, land
would first have to be proven "not subject to flooding or
not unsuitable because of drainage conditions." If this
were the case, a special permit could be granted since it
would not be in conflict with the general purpose of the
by-law, which is to protect several classes of people from
overdevelopment of land subject to flooding.

6. We next discuss the petitioner's contention that the

by-law, both on its face and as applied to its particular land, is unconstitutional.

We have previously reviewed the purposes of the by-law and have determined that they comply with the authority granted by the enabling statute, G. L. c. 40A. To hold the by-law unconstitutional, we would have to hold that its terms are "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Euclid* v. *Ambler Realty Co.* 272 U. S. 365, 395. *Wilbur* v. *Newton*, 302 Mass. 38, 39, and cases cited. "Every presumption is to be afforded in favor of the validity of . . . [a by-law] and if its reasonableness is fairly debatable the judgment of the local authorities who gave it its being will prevail." *Schertzer* v. *Somerville*, 345 Mass. 747, 751, and cases cited. The petitioner must sustain a "heavy burden" of showing that the by-law is in conflict with (a) the enabling act, G. L. c. 40A, or (b) applicable constitutional provisions. *Pierce* v. *Wellesley*, 336 Mass. 517, 521.

The general necessity of flood plain zoning to reduce the damage to life and property caused by flooding is unquestionable. See Dunham, Flood Control Via the Police Power, 107 U. of Pa. L. Rev. 1098; Note, Flood Plain Zoning for Flood Loss Control, 50 Iowa L. Rev. 552; Comment, State Flood-Plain Zoning, 12 De Paul L. Rev. 246; Comment, Zoning the Flood Plains of Ohio, 1969 U. Toledo L. Rev. 655. See also Task-Force on Federal Flood Control Policy, A Unified National Program for Managing Flood Losses, 1966 H. R. Doc. No. 465, 89th Cong., 2d Sess., 3. The principal criterion as to the reasonableness of the inclusion of the petitioner's land in the flood plain district is the extent of the flood hazard to its land. The judge's decision on this point contains the following: "There was extensive evidence on elevation, topography, dams, flood control, flood gates all bearing on the issue whether or not the locus was subject to 'seasonal' or 'periodic' flooding; this

included photographs, exhibits reflecting the elevation of the locus in relation to the Charles River . . . as well as evidence concerning the level of the Charles River from 1954 to 1967 . . . . The evidence indicated that there was a reasonable basis for the judgment of the town meeting that the land to be included in the 'Flood Plain District' is, in fact, subject to seasonal or periodic flooding and that the determination of the Town Meeting that the locus was subject to flooding was not unreasonable or capricious. A view of the locus further supported this testimony and disclosed that most of the locus consisted of lowlands covered with marshgrass and scrub growth. The only apparent areas on 'high' ground within the locus consisted of the 3.2 acre and .2 acre knolls."

The evidence clearly supported the judge's conclusion. One Robert A. Barrows, an expert hydrologist, testified for the respondent that, in his opinion, the petitioner's land "will have water on it, ranging anywhere from practically nothing up to . . . three feet of water annually." He further testified that once the flow in the Charles River exceeds 1,280 cubic feet a second, which is equivalent to the approximate elevation of the petitioner's land (92.5 feet), the petitioner's land will be flooded. The flow of the Charles River, according to Barrows, exceeded that level in 1936, 1938, 1955 and 1968. Barrows stated that he personally went to the petitioner's land in March, 1968, and observed that it was covered with "approximately four to five feet of water."

As we have stated, the restrictions in the by-law serve to protect not only those who might choose to develop or occupy the land in spite of the dangers to themselves and their property (see *Pinnick* v. *Cleary*, 360 Mass. 1, 24–25, and cases cited), but also other people in the community from the harmful effects of flooding.[5] Similarly, there is a substantial public interest in avoid-

[5] Barrows testified that if the petitioner's land was filled, this "could cause the water to rise higher at other points."

ing the public works and disaster relief expenditures connected with flooding.

In *Vartelas* v. *Water Resources Commn.* 146 Conn. 650, 654, the court stated: "The police power regulates use of property because uncontrolled use would be harmful to the public interest. Eminent domain, on the other hand, takes private property because it is useful to the public."

The petitioner, moreover, has not been deprived of all beneficial uses of its property. The by-law specifically permits "Any woodland, grassland, wetland, agricultural, horticultural or recreational use of land or water not requiring filling." Although it is clear that the petitioner is substantially restricted in its use of the land, such restrictions must be balanced against the potential harm to the community from overdevelopment of a flood plain area. In *Morris County Land Improvement Co.* v. *Township of Parsippany-Troy Hills*, 40 N. J. 539, 556, fn. 3, a case heavily relied upon by the petitioner, the court stated: "There is no substantial evidence in this case that the matter of intra-municipal flood control had any bearing on the adoption of the meadows zone regulations. . . . This case, therefore, does not involve the matter of police power regulation of the use of land in a flood plain on the lower reaches of a river by zoning, building restrictions, channel encroachment lines or otherwise and nothing said in this opinion is intended to pass upon the validity of any such regulations."

7. The petitioner introduced testimony of an expert witness that prior to the enactment of the by-law the best use of the petitioner's land was for apartment buildings, and after the enactment the best use was for agriculture. He further testified that the value of the lowlands was $431,000 prior to becoming subject to the by-law, and $53,000 after the by-law's enactment, a reduction in value of about eighty-eight per cent. The petitioner argues that the reduction was of such magnitude that the enactment of the by-law must be con-

sidered the equivalent of a taking without just compensation.

The judge after referring to the testimony of the petitioner's expert as set out above stated that "[t]he respondent's witness testified that the value of the lowlands was not affected by the Flood Plain District as the nature of the terrain was such as to make the construction of housing on the locus under the General Residence Zone not economically feasible."

The transcript shows there was evidence contrary to the figures stated by the petitioner's expert. Although the judge in his decision made references to the testimony of both the petitioner's and the respondent's witnesses regarding the value of the land before and after the enactment of the by-law, he did not set any value thereon. He stated: "Although there was a substantial diminution in value of the locus, the mere decrease in the value of a particular piece of land is not conclusive evidence of an unconstitutional deprivation of property."

"There is no set formula to determine where regulation ends and taking begins. Although a comparison of values before and after is relevant . . . it is by no means conclusive, see *Hadacheck* v. *Sebastian* . . . [239 U. S. 394], where a diminution in value from $800,000 to $60,000 was upheld." *Goldblatt* v. *Hempstead*, 369 U. S. 590, 594. See *Euclid* v. *Ambler Realty Co.* 272 U. S. 365. See also *Caires* v. *Building Commr. of Hingham*, 323 Mass. 589, 594; *Massachusetts Broken Stone Co.* v. *Weston*, 346 Mass. 657, 661; *Anderson* v. *Wilmington*, 347 Mass. 302, 304. But see *Dooley* v. *Town Plan & Zoning Commn. of Fairfield*, 151 Conn. 304, 310.

We realize that it is often extremely difficult to determine the precise line where regulation ends and confiscation begins. The result depends upon the "peculiar circumstances of the particular instance." *Pittsfield* v. *Oleksak*, 313 Mass. 553, 555. In the case at bar we are unable to conclude, even though the judge found that there was a substantial diminution in the value of the petitioner's land, that the decrease was such as to render

it an unconstitutional deprivation of its property.

8. The petitioner argues that the finding and ruling of the judge that the 3.2 acre and .2 acre knolls were included in the flood plain district and subject to the by-law was contrary to the evidence. However, the evidence on this point was conflicting. The town engineer, at the request of the town conservation commission, made a zoning map as it related to flood plain districts. He was instructed to put in the flood district "all the swamp areas" below ninety-eight feet, and to designate them by coloring them green. The elevations of the knolls were 121 feet and 111 feet. Both were colored in the flood plain district despite elevations in excess of ninety-eight feet. They were shown as colored on the map at the town meeting which adopted the by-law. The town clerk testified that the map he submitted to the Attorney General was a "true copy of the Flood Plain District as created by vote of the Town Meeting."

In finding and ruling that the knolls were included in the flood plain district, the judge appeared to reason that although their inclusion "may have been inadvertent," the petitioner "would not have been able to utilize these areas for the purposes authorized under the underlying zone (General Residence) without obtaining a special permit from the Board of Appeals for access to it over the surrounding flood plain district zone." We think this was a sensible conclusion. See *Parmenter* v. *Board of Appeals of Grafton,* 360 Mass. 852. As we have previously stated, this is a situation which the special permit procedure under paragraph 4 was intended to cover.

9. The petitioner argues that under G. L. c. 40A, § 2, the respondent was required to make a "reasonable determination" that land to be included in a flood plain district is in fact subject to seasonal or periodic flooding. It contends, in summary, that flood plain zoning is a radical departure from ordinary zoning concepts, and that the Legislature intended that a narrower standard of validity be used.

We have previously stated our view that the authority

to enact flood plain zoning by-laws is contained in the general grant of power to zone for the public health, safety, and welfare, and is not limited by the last sentence of G. L. c. 40A, § 2. There is nothing to indicate that our familiar rule should not apply: " '[a]ll rational presumptions are made in favor of the validity of every legislative enactment. Enforcement is to be refused only when it is in manifest excess of legislative power.' *Commonwealth* v. *Finnigan*, 326 Mass. 378, 379. *Massachusetts Commn. Against Discrimination* v. *Colangelo*, 344 Mass. 387, 390. *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414, 422." *Mobil Oil Corp.* v. *Attorney Gen.* 361 Mass. 401, 412–413. The same is true of a zoning by-law. *Caires* v. *Building Commr. of Hingham*, 323 Mass. 589, 594. *Lanner* v. *Board of Appeal of Tewksbury*, 348 Mass. 220, 228. We find nothing wrong with the judge's ruling that the respondent "acted reasonably when, in the words of the [e]nabling [a]ct, it impliedly 'deemed' the locus to be subject to 'seasonal' or 'periodic' flooding." No express findings by the town meeting were required.

10. All of the petitioner's contentions have been considered. There was no error.

*Exceptions overruled.*

TAURO, C.J. (concurring). The judge below has raised the question of "substantial diminution" in value without indicating the extent of the diminution. The majority opinion takes the position that the court is unable to conclude that the "substantial diminution" in value caused by the by-law was such as to render the by-law unconstitutional. In my view, this statement in the majority opinion might be used (possibly without justification) as a reason for the administrative denial of future petitions for special building permits. For this reason, I would add the following statement to the opinion: "[W]e need not now decide whether the . . . [petitioner is] the 'uncompensated victim . . . of a taking invalid

362 Mass. 239                                              239

without compensation.' *Commissioner of Natural Resources* v. *S. Volpe & Co. Inc.* 349 Mass. 104, 111. That decision may depend in part on the board's . . . action on the . . . [possible petitioner's] application for . . . [a] special permit." *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 641.