724            441 Mass. 724 (2004)

Home Builders Association of Cape Cod, Inc. *v.* Cape Cod Commission.

HOME BUILDERS ASSOCIATION OF CAPE COD, INC., & another[1] *vs.* CAPE COD COMMISSION & others.[2]

Barnstable. March 4, 2004. - May 19, 2004.

Present: GREANEY, IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Cape Cod Commission. Barnstable. Practice, Civil,* Standing. *Municipal Corporations,* Water supply. *Housing. Zoning,* Low and moderate income housing, Limitation on rate of development.

Discussion of the statutory and regulatory framework governing districts of critical planning concern, a land use planning device for certain geographic areas of Cape Cod requiring special protection. [728-733]

Plaintiffs in a declaratory judgment proceeding had standing to challenge the validity of a particular district of critical planning concern, a land use planning device which the plaintiffs showed would cause them economic harm. [733]

This court concluded that the district of critical planning concern (DCPC) consisting of the town of Barnstable was valid under St. 1989, c. 716, where evidence showed that the DCPC preserved or maintained water resources, a natural resource covered under § 10(*a*)(1) of the Act, and the fact that the DCPC, in its efforts to preserve water quality, also justifiably preserved some land for affordable housing, did not negate its validity. [733-739]

A Superior Court judge erred in granting summary judgment to the plaintiffs in a declaratory judgment action challenging the validity of a town-wide district of critical planning concern (DCPC), where nothing in the act establishing DCPCs expressly or impliedly prohibited a town-wide DCPC. [739]

CIVIL ACTION commenced in the Superior Court Department on March 20, 2001.

The case was heard by *Gary A. Nickerson,* J., on motions for summary judgment.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Robert D. Smith,* Town Counsel (*Ruth J. Weil,* Assistant Town Counsel with him) for town of Barnstable & another.

---

[1] Mogan and Company, Incorporated.

[2] The town council of Barnstable and the town of Barnstable.

*Eric W. Wodlinger* (*Jennifer A. Jester* with him) for Cape Cod Commission.

*E. James Veara* for the plaintiffs.

The following submitted briefs for amici curiae:

*Ronald H. Rappaport & Michael A. Goldsmith* for town of Aquinnah.

*John A. Pike* for Massachusetts Municipal Association.

*James J. Decoulos*, pro se.

GREANEY, J. We transferred this case here on our own motion to decide whether a district of critical planning concern (DCPC), comprising the entire town of Barnstable (Barnstable DCPC), is valid under St. 1989, c. 716, "An Act establishing the Cape Cod commission" (Act). A DCPC is, essentially, a land use planning device that in this case was used to establish a rate of development in a Cape Cod municipality in order to preserve certain resources pursuant to a complex legislatively authorized regulatory scheme that we shall describe shortly. A judge in the Superior Court concluded that the Barnstable DCPC was invalid under the Act, ordered the entry of a declaration so stating, and allowed summary judgment in favor of the plaintiffs. The judge simultaneously denied the defendants' motions for summary judgment. We conclude that the plaintiffs did not establish that the Barnstable DCPC is invalid under the Act and direct entry of a judgment for the defendants.

1. *Background.* The background of the case is drawn from the parties' statement of agreed facts and evidence. On February 22, 2001, the Barnstable town council (town council) voted nine to one to adopt a resolution supporting the town manager's nomination of the town as a DCPC under the Act. The nomination was made "to address the rate of residential development" in the town, which, if continued at its present growth rate "would have serious consequences for municipal infrastructure" and would "move the town further away from its goal of [providing] [ten per cent] affordable housing stock." The nomination proposed an "[a]ffordable [h]ousing [i]mplementation and [g]rowth [m]anagement [d]istrict" to "schedule" the rate of development in the town. Suggested guidelines for development in the proposed district included an annual residential building permit cap ordinance with a preference for

affordable housing, and a general ordinance and board of health regulation "limiting nitrogen discharged from new residential subdivisions (e.g. shared denitrifying system requirements)." The nomination was submitted with the following supporting documents: the Barnstable zoning map; the Barnstable local comprehensive plan (LCP) which was adopted by the town council in October, 1997, and approved by the defendant Cape Cod commission (commission) in February, 1998; the Barnstable zoning ordinance; the Barnstable general ordinance; the Barnstable affordable housing plan; the Barnstable capital improvements plan; town wide build-out calculations (updated from the 1996 LCP); and a "section 7 smart growth committee report."[3]

The nomination was forwarded to the commission, and the commission voted to accept the nomination for consideration. On April 26, following a public hearing on the proposed Barnstable DCPC, the commission voted to forward the designation, together with a proposed county ordinance, to the Barnstable county assembly of delegates (assembly)[4] for approval. In its decision to recommend designation, the commission published, as required by the Act, guidelines for development in the Barnstable DCPC (guidelines). The assembly referred the proposed Barnstable DCPC and ordinance back to the commission for restudy, and requested answers to five questions concerning the

---

[3]"Section 7" refers to § 7 of the Barnstable LCP that was adopted in October, 1997, and specifically to "Strategy 7.1.1.1," which provides: "to ensure compatible residential development, the existing zoning district should be revisited and evaluated based upon natural features and the level of existing services in an area. Performance standards should be investigated as a means of assuring that residential development is suitable to the locality. Zoning districts should be developed to reflect the uses and pattern of development that presently exists on the land."

[4]The assembly is the legislative body of the regional government of Barnstable County established by the Barnstable County Home Rule Charter. Revised Barnstable County Home Rule Charter § 2-1 (a) (2000). The assembly consists of fifteen members, with one member "elected by and from the voters in each of the municipalities of Barnstable county." *Id.* Eight delegates must be present for the assembly to act, and the "affirmative votes of delegates representing a majority of the population of Barnstable county shall be necessary to adopt any ordinance, resolution, appropriation order, or to take any other official action as the Cape Cod regional government's legislature." *Id.* at § 2-5 (c). Publication of a proposed ordinance and notice of a public hearing concerning the proposed ordinance are prerequisites to any action taken by the assembly on a proposed ordinance. *Id.* at § 2-8 (e), (f), (g).

proposed DCPC. On July 18, the commission forwarded an amendment to the proposed ordinance and responses to the assembly's questions.

On July 19, the town council voted to amend its zoning ordinance to include a building cap mechanism. The amendment was proposed as implementing regulations in the event that the proposed Barnstable DCPC was adopted by the assembly. On September 5, the assembly voted to adopt the ordinance designating the Barnstable DCPC (ordinance 01-19). The ordinance then was approved by the board of county commissioners[5] and, on September 13, was recorded at the Barnstable county registry of deeds.

On September 7, the town submitted to the commission its amendment to its zoning ordinance as its proposed regulations implementing the Barnstable DCPC. Following a public hearing, the commission, on September 20, voted to approve the implementing regulations as consistent with the guidelines, and issued a certificate of consistency to that effect. The town's implementing regulations became effective the following day.[6]

The plaintiffs are the Home Builders Association of Cape

[5]The board of county commissioners, or the board of regional commissioners, as it is referred to in the revised Barnstable County Home Rule Charter, is the executive branch of the regional government of Barnstable County. Revised Barnstable County Home Rule Charter § 3-1 (2000). Cf. St. 1988, c. 163, § 1. The board consists of three elected members and is charged with enforcing the home rule charter and the laws, ordinances, and orders of the regional government. Revised Barnstable County Home Rule Charter, *supra* at § 3-2. A vote of two members of the board is required for it to act. *Id.* at § 3-1(d). With some minor exceptions, "[e]very order, ordinance, resolution or other vote of the assembly of delegates pertaining to the business and affairs of the Cape Cod regional government . . . shall forthwith following its adoption be presented to the board of regional commissioners." *Id.* at § 3-8. A measure that is not approved by the board may still be passed on "a vote of [the assembly's] members representing two-thirds of the population of Barnstable county." *Id.*

[6]The implementing regulations, taking the form of a town ordinance, cap the number of residential building permits issued within the Barnstable DCPC. Only two types of building permits may issue: an "[a]ffordable [p]ermit" ("[a] [b]uilding [p]ermit to construct an [a]ffordable [d]welling [u]nit") and a "[m]arket [p]ermit" (a "[b]uilding [p]ermit to construct a market rate [r]esidential [d]welling [u]nit"). The caps are as follows: 183 total permits in 2001; 168 permits in 2002 (132 market and 36 affordable); 162 permits in 2003 (126 market and 36 affordable); 144 permits in 2004 (108 market and 36

Cod, Inc. (Home Builders), a nonprofit association of Cape Cod home builders whose members are actively involved in the construction trade throughout Barnstable County, and Mogan and Company, Incorporated (Mogan), a home builder doing business on Cape Cod. The plaintiffs commenced suit in the Superior Court seeking injunctive and declaratory relief. The plaintiffs initially sought a preliminary injunction, which was denied. The order denying that relief has not been appealed. This proceeding concerns the parties' cross motions for summary judgment in connection with the plaintiffs' prayer for two declarations: (1) that the Barnstable DCPC is unlawful. under the Act; and (2) that "no entire [t]own within Barnstable County may be considered appropriate for nomination and/or designation as a DCPC under the terms of the Act."

Noting that there is "no precedent for a town-wide DCPC under [the Act]," the judge concluded that a DCPC could not be town wide. He also concluded that the Barnstable DCPC did not maintain or preserve a resource or value protected under § 10 (*a*) of the Act. The judge, interpreting the history of this DCPC, understood it to be designed to protect only economic resources, and he decided that the Act requires the existence of a specific economic resource of critical value to the region. He explained, in support of his decision, that the Barnstable DCPC's "generalized concerns about affordable housing and phased development," concerns shared by most of the towns on Cape Cod, did not satisfy the requirement. The judge allowed the plaintiffs' motion for summary judgment, and ordered that a declaration enter stating that the Barnstable DCPC "is void as being an act in excess of the authority of the [Act]." He simultaneously denied the defendants' cross motions for summary judgment.

2. *The statutory and regulatory framework.* The Act, amended in ways not relevant here, see St. 1990, c. 2, was enacted as a local option law that was approved at a special county election

---

affordable); and 132 permits in 2005 and beyond (96 market and 36 affordable). Prior to the cap, from 1990 through 2000, the town granted an average of 217 building permits per year for new single-family dwellings.

held by all fifteen municipalities of Barnstable county.[7] See St. 1989, c. 716, §§ 18, 21. The Act created the commission, the "regional planning and land use commission for Cape Cod." *Id.* at § 3(*a*). The commission is denominated "an agency within the structure of Barnstable county government." *Id.* It consists of nineteen members, including a representative from each of the county's fifteen municipalities, who are appointed by each municipality's board of selectmen;[8] one county commissioner for Barnstable County, who is appointed by the board of county commissioners; one Native American and one minority, each appointed by the board of county commissioners; and one minority who is appointed by the Governor. *Id.* at § 3(*b*). Each member must be a resident and a registered voter of one of the towns of Barnstable County. *Id.* Each member has one vote, except the Governor's appointee, who votes only in the case of a tie vote. *Id.* Unless otherwise required, the commission "may act upon a vote by a simple majority of the voting members present." *Id.* at § 3(*g*). The commission's staff must include an executive director; a specialist in fair, affordable housing; a chief planner; an economic development officer; and a chief regulatory officer, "each of whom shall have education and experience in land use planning or regulation." *Id.* at § 3(*h*).

Section 1 of the Act states its purposes and the purposes of the commission:

> "(*a*) The region commonly known as Cape Cod . . . possesses unique natural, coastal, scientific, historical, cultural, architectural, archaeological, recreational, and other values; there is a regional, state and national interest in protecting, preserving and enhancing these values; and these values are being threatened and may be irreparably damaged by uncoordinated or inappropriate uses of the region's land and other resources.

> "(*b*) In order to protect these values and promote the

---

[7]The municipalities are Barnstable, Bourne, Brewster, Chatham, Dennis, Eastham, Falmouth, Harwich, Mashpee, Orleans, Provincetown, Sandwich, Truro, Wellfleet, and Yarmouth. See St. 1989, c. 716, § 2 (*r*).

[8]The Act provides that a municipality's chief executive officer may be substituted for a board of selectmen where no such board exists in the municipality. St. 1989, c. 716, § 2 (*v*).

730 441 Mass. 724 (2004)

Home Builders Association of Cape Cod, Inc. *v.* Cape Cod Commission.

public health, safety and general welfare, to maintain and enhance sound local and regional economies, and to ensure balanced economic development, this act creates the Cape Cod commission as the regional planning and land use commission with authority to prepare and oversee the implementation of a regional land-use policy plan for all of Cape Cod, to recommend for designation specific areas of Cape Cod as districts of critical planning concern [DCPCs], and to review and regulate developments of regional impact.

"(c) The purpose of the [commission] shall be to further: the conservation and preservation of natural undeveloped areas, wildlife, flora and habitats for endangered species; the preservation of coastal resources including aquaculture; the protection of groundwater, surface water and ocean water quality, as well as the other natural resources of Cape Cod; balanced economic growth; the provision of adequate capital facilities,[9] including transportation, water supply, and solid, sanitary and hazardous waste disposal facilities; the coordination of the provision of adequate capital facilities with the achievement of other goals; the development of an adequate supply of fair affordable housing; and the preservation of historical, cultural, archaeological, architectural, and recreational values.

"(d) The commission shall: anticipate, guide and coordinate the rate and location of development with the capital facilities necessary to support such development; review developments which will have impacts beyond their local community and determine the comparative benefits and detriments of those projects and their consistency with the regional policy plan and local comprehensive plans and goals; identify and protect areas whose characteristics make them particularly vulnerable to adverse effects of development; preserve the social diversity of Cape Cod by promoting fair affordable housing for low-income and moderate-income persons; promote

---

[9]The Act defines "[c]apital facilities" as "public facilities and services necessary to support development, including but not limited to roads, water, sewers, waste disposal, affordable housing, schools, police and fire protection services." St. 1989, c. 716, § 2(c).

the expansion of employment opportunities; and implement a balanced and sustainable economic development strategy for Cape Cod capable of absorbing the effects of seasonal fluctuations in economic activity."

The Legislature granted the commission "those powers necessary [and] convenient to carry out the purposes and provisions of this [A]ct." St. 1989, c. 716, § 4(*a*). Among those powers, the Legislature enumerated twenty-seven specific powers, including (§ 4[*a*][11]) the power "to promulgate and amend rules and regulations as appropriate to carry out its responsibilities" under the Act. *Id.* at § 4(*a*)(1)-(27). Among the regulations required to be promulgated by the commission, pursuant to a process specified in the Act, are "regulations concerning the process of designating districts of critical planning concern." *Id.* at § 6(*a*).

The Act defines a "[d]istrict of critical planning concern," or DCPC, as "a geographic area of Cape Cod identified by the commission as requiring special protection and designated by the assembly of delegates in accordance with the criteria, procedures and requirements set forth in sections ten and eleven." *Id.* at § 2(*j*). Section 10(*d*) provides who may make a DCPC designation. Among those authorized to designate a DCPC are the commission and a municipality's board of selectmen. *Id.* See note 8, *supra*. The criteria of a DCPC are specified under § 10(*a*) of the Act. That section provides:

"(*a*) The commission may propose the designation of certain areas which are of critical value to Barnstable county as districts of critical planning concern that must be preserved and maintained due to one or more of the following factors:

"(1) the presence of significant natural, coastal, scientific, cultural, architectural, archaeological, historic, economic or recreational resources or values of regional, state-wide or national significance; or

"(2) the presence of substantial areas of sensitive ecological conditions which render the area unsuitable for development; or

"(3) the presence or proposed establishment of a major capital public facility or area of public investment."

*Id.* at § 10(*a*). The Act further provides:

"[DCPCs] may cover areas located in more than one municipality. Similar resources in different areas of Barnstable county should be treated similarly unless the commission makes a written finding that there are valid reasons based upon local differences and characteristics to justify treating them differently."

*Id.* at § 10(*c*).

The Act then goes on to explain the procedures for the review of nominations of DCPCs, which, in basic terms, require, after notice to the public and public hearings, the acceptance of the commission,[10] and approval, in the form of an ordinance, by both the assembly and the board of county commissioners.[11] *Id.* at § 10(*b*), (*f*), (*i*), (*j*). See also notes 4 & 5, *supra*. In its decision approving a DCPC, the commission is required to "specify guidelines for development in the district based upon its findings relating to the critical concerns in the area." *Id.* at § 10(*j*). After the adoption of an ordinance approving a DCPC's designation, "a municipality whose boundaries include all or part of that district shall propose implementing regulations which are consistent with the guidelines for the development."[12] *Id.* at § 11(*d*). Once approved by the commissioner, the implementing regulations "shall be incorporated by the municipality into the official by-laws, regulations and maps of the municipality," and "shall be administered by the municipality as part of its development by-laws." *Id.* at § 11(*e*). Except for certain enumerated exceptions not relevant here, "[n]o municipal agency may grant a development permit for a development in a [DCPC] unless the proposed development is consistent with the

---

[10]The commission has promulgated regulations concerning the form and content of nominations, and their review. St. 1989, c. 716, § 10(*g*).

[11]The commission's acceptance of a DCPC nomination for consideration "shall [with exceptions not relevant here] continue to suspend the power of a municipality to grant development permits for development within the nominated district." St. 1989, c. 716, § 11(*c*).

[12]If a municipality fails to propose implementing regulations, the obligation falls on the commission. St. 1989, c. 716, § 11(*f*).

. . . implementing regulations . . . ." *Id.* at § 11(*g*).[13] All approved DCPCs are required to be recorded, and notice of the designation must be published in various newspapers. *Id.* at § 10(*l*).

3. *Standing.* We conclude, contrary to the commission's argument, that there is a basis to find standing. In declaratory judgment proceedings, standing requirements should be liberally construed. See *Massachusetts Ass'n of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 293 (1977). The plaintiffs have shown that, among other consequences, they, and builders, will incur economic detriment by reason of delay in the issuance of building permits and in construction and other costs. The assembly also recognized that the Barnstable DCPC would have economic impact on the building industry. The merits, thus, are appropriate for review now.

4. *The Barnstable DCPC.*

a. *Validity under § 10(a) of the Act.* Operating on the assumption that the Barnstable DCPC was predicated solely on the "resource" of remaining developable land and its potential to be developed as affordable housing, the plaintiffs claim that the DCPC is invalid because neither the lack of a sufficient supply of affordable housing, nor the effort to preserve developable land in the town, properly are considered "economic" resources under § 10(*a*)(1) of the Act. This is an issue of difficulty, especially in view of the rapid development of land on Cape Cod, the exponentially expanding residential growth, and the complicated (and controversial) issues concerning commitments, both on Cape Cod and elsewhere, to provide affordable housing. See generally Regnante, Compelling Reasons Why the Legislature Should Resist the Call to Repeal Chapter 40B, 88 Mass. Law Rev. 77 (2003). However, we conclude that the Barnstable DCPC should be upheld because there is sufficient data and evidence to show that the DCPC preserves or maintains a "natural" resource covered under § 10(*a*)(1) of the Act, namely water resources. Under the Act, only one of the factors under subsections 1, 2, and 3 of § 10(*a*) need be shown, and the

---

[13]It is undisputed that DCPC implementing regulations are not subject to a zoning "freeze" under G. L. c. 40A, § 6. See *Island Props., Inc.* v. *Martha's Vineyard Comm'n*, 372 Mass. 216, 217 n.1, 232 (1977).

record plainly supports the "natural" resource factor. This being the case, we need not resolve the parties' contentions concerning "economic" resources under the Act.

The judge incorrectly stated that "[a]ll agree [that the Barnstable] DCPC was not founded on natural, coastal, scientific . . . resources or values." In its motion for summary judgment, the commission expressly argued: "The Barnstable DCPC also preserves and maintains natural, coastal, and recreational resources, consistent with [§] 10(*a*)(1) of the Act." The commission went on to explain that the Barnstable DCPC was nominated and designated to preserve and maintain the sole source aquifer, shared by all of the communities on the Cape, and the town's coastal embayments, natural resources threatened by development. Even the plaintiffs, in the their reply to the defendants' motions for summary judgment, understood that the issue was a live one: "The Commission devotes a good portion of its [b]rief to assert that the [t]own's ground water is the natural resource the DCPC designation seeks to protect."

In addition, in its appellate brief, Home Builders contradicts its statement that the defendants "have essentially dropped the pretense that the DCPC is based upon the presence of one of the natural resources specified in [§] 10(*a*)(1)," by its later statement that the defendants, in support of the Barnstable DCPC, "cite natural resources, but their pertinence seems limited to groundwater." Mogan concedes that the ordinance designating the Barnstable DCPC "does proceed lengthily with pronouncements about natural resources," but argues that the pertinence is "obscure," and that the *nomination* failed to mention this resource. As to the former issue, the "pertinence" of the "pronouncements" is hardly relevant to a claim of waiver. As to the latter issue, Mogan reads the nomination form too narrowly, and in isolation from its supporting documents. Although the town's responses contained in the form could have been more detailed, the form is but one document in a lengthy, open, comprehensive process governed by detailed statutory and regulatory provisions; it is the paper, a simplified form drafted by the commission, by which this comprehensive process commences. See Barnstable County Ordinance 90-15, § 4. That lengthy process invites scrutiny from other entities,

including the commission, whose members are required by the Act to "have education and experience in land use planning or regulation," St. 1989, c. 716, § 3(*h*), the assembly, the board of commissioners, and the public, thereby ensuring evolution from the original form.

That being said, however, the nomination form clearly states, and the commission members could not have overlooked, the identification of wastewater issues as a specific municipal infrastructure concern and, thus, an important reason for the proposed DCPC. In the nomination form, the town identified an ongoing wastewater management plan as relating to the proposed DCPC, and identified as a guideline for development (of the proposed DCPC) a general ordinance and a board of health regulation "limiting nitrogen discharged from new residential subdivisions (e.g. shared denitrifying system requirements)." In addition, in the supporting documents to the nomination form, wastewater issues, as infrastructure improvements needed to protect the water supply and waterways, are thoroughly discussed in the LCP, specifically, in §§ 2.1, 2.2, 4.4, and 4.5, and in the § 7 smart growth committee report. The § 7 smart growth committee was appointed specifically to explore and make recommendations on the town's wastewater. facilities plan, and in "managing growth and control[ling] nitrogen loading in [the town's] aquifers, [b]ays, and embayments and other waterways." The committee's report discusses, among other concerns, "the need to maintain good water quality," and the need to remediate "water quality in [coastal] embayments."

The plaintiffs bear the burden of proving that the Barnstable DCPC is invalid under the Act. See *Johnson* v. *Edgartown*, 425 Mass. 117, 124 (1997); *Turnpike Realty Co.* v. *Dedham*, 362 Mass. 221, 233 (1972), cert. denied, 409 U.S. 1108 (1973). The burden is a heavy one. *Id.* See *Sturges* v. *Chilmark*, 380 Mass. 246, 256 (1980). In this respect the plaintiffs fail fully to appreciate the comprehensive process established by the Legislature for the nomination and designation of a DCPC. Significant in this process is the fact that both the assembly and the board of county commissioners, acting in a *legislative* capacity, approved the Barnstable DCPC. We do not second guess legislative decisions

that have record support unless it is shown, with relative certainty, that the legislative decision is contrary to the Constitution, the enabling act, or a statute. *Turnpike Realty Co.* v. *Dedham, supra; W.R. Grace & Co.-Conn.* v. *City Council of Cambridge,* 56 Mass. App. Ct. 559, 566 (2002); *National Amusements, Inc.* v. *Boston,* 29 Mass. App. Ct. 305, 309 (1990), and cases cited. This is so because the local legislative body is deemed to understand the local conditions and can exercise its police power to the widest possible extent consistent with the law. See *Fitzsimonds* v. *Board of Appeals of Chatham,* 21 Mass. App. Ct. 53, 57 (1985).

The plaintiffs have not satisfied their burden. A principal purpose supporting the designation of the Barnstable DCPC is the "preserv[ation] and maint[enance]" of significant water resources, a "natural" resource under § 10($a$)(1) of the Act. This finding is entitled to deference, and the further legislative findings pertaining to water resources, too lengthy to be repeated or summarized here, are detailed and comprehensive. They are by no means "conclusory" and lacking in "explanation," words used by the plaintiffs to attempt to circumvent their potency.

What emerges from the findings is that the Barnstable DCPC was designated, among other reasons, to protect the local and regional water supply, the sole source aquifer, from contamination occurring from excessive development (specifically, from associated nitrogen contamination primarily caused by septic systems), and also to protect coastal embayments from nitrogen contamination, which threatens to impact adversely local and regional shellfishing in the embayments.

These legislative findings have a foundation in fact and data. United States census figures support the findings concerning the population and growth rate in Barnstable. A "buildout update" report by the Barnstable planning division sets forth the numbers concerning potentially buildable lots, units, and sanitary systems. As for the issues of protecting the public and regional water supply, and coastal embayments, support for protecting these natural resources can be found in the LCP, the July 3, 2001 updated LCP, the § 7 smart growth committee report, and the commission's regional policy plan (RPP). As to the significance of both the sole source aquifer and Barnstable's

coastal embayments in both Barnstable and the region, the LCP alone makes that significance clear (but the RPP also supports the significance of these resources on the regional level).

With respect to the water supply and the sole source aquifer, the LCP explains that "[g]roundwater is a vital natural resource — it is the only source of drinking water. Groundwater flows through layers of saturated sands and gravels to form an extensive 'unconfined aquifer' throughout the Cape. Public wells draw water from wide areas known as Zones of Contribution." The entire town of Barnstable "lies atop a sole source aquifer and approximately 27% of the land area lies within one or more zones of contribution to Barnstable's 31 public water supply wells." Thus, "[w]ater supply is an issue which crosses town boundaries and should be eventually addressed on a regional basis." The LCP explains that "[t]here is vulnerability to contamination because of the extensive areas which contribute to public wells, the coarse grained soils which drain rapidly, and because of the low lying nature of the land, with little depth to groundwater."[14] "With growth and development, contamination of ground and surface waters becomes of increasing concern." One of the principal sources of contamination is nitrogen from septic systems, and certain areas in the

---

[14]The LCP describes the particular characteristics of the town:

> "The Town of Barnstable is centrally located on Cape Cod, a sandy peninsula which juts out into the ocean. The land is low lying, with extensive areas of wetlands, ponds and marshes. The boundaries with the sea are flat, there are no rocky cliffs, and the sea and shore form a shifting pattern of sandy beaches, dunes, estuaries and marshes. The highest elevation is less than 250 feet."

In addition, the LCP identifies "[c]ritical environment resource" areas, classified as "[e]xtremely [s]ensitive [a]reas," which comprise barrier beaches, wetlands, vernal pools and waterbodies, Federal Emergency Management Agency velocity zones, wellhead buffer zones to public supply wells, and rare and endangered species habitat; "[v]ery [s]ensitive [a]reas," which comprise well protection zones, 300 foot buffers to all ponds, lakes and streams, and one hundred year flood plain; and "[s]ensitive [a]reas," which comprise zone of contribution areas to public supply wells, coastal recharge areas, impervious soils, and areas dependent on private wells. A map showing all three categories of areas reveals that, indeed, most of the town is comprised of "critial environmental resources."

town are "experiencing effects of contamination, probably from nutrients in septic system effluent."

Turning to coastal embayments, the LCP explains that "[s]hellfish are abundant in the shallow, sheltered coastal embayments in Barnstable. Clams, both soft-shelled and hard-shelled, scallops and oysters can be found in the saltwater embayments along the shore. Cotuit oysters have been cultivated since the mid-19th century [and] are internationally renown[ed] delicacies. There are approximately 6,178 acres of shellfish beds. Shellfish resources are the basis of a traditional economic pursuit and a recreational pastime, and are special features of local menus. Shellfish resources require pristine water quality conditions and are the canaries of water quality. In recent years contamination of coastal waters has caused a decline in harvests; in 1991, a total of 1,093 acres of shellfish beds were closed to harvesting because of contamination." The LCP further explains that "[c]ontamination of . . . salt water embayments will have a devastating impact on the capability of the coastal resources to serve as a spawning ground and nursery for both freshwater and saltwater species." The LCP explains that measures taken to control nitrogen levels in the public water supplies "may not be stringent enough to protect water quality in coastal embayments which are extremely sensitive to nitrogen in very low concentrations."

Claims made by the plaintiffs that it is extremely doubtful that residential construction will exacerbate existing nitrate loading, and that the newer provisions of Title V (regulating septic systems) will prevent new construction from adding excess nitrogen to the groundwater, are points of disagreement naturally expected in the process of legislative deliberation. As to the first point, the commission concluded to the contrary, stating that further development of the area would "exacerbate[] the need for significant infrastructure improvements," including nitrogen management. As to the second point, the LCP identifies as a problem the fact that "Title 5 systems do not remove nitrogen that is traveling in groundwater, from the center of the town to the shore." What is key, and what the plaintiffs overlook, is that there was substantial planning and study behind the nomination of the Barnstable DCPC, and that its purpose of

protecting a natural resource, water resources, of town and regional significance is supported in the record, rendering the legislative action by the assembly and board of county commissioners consistent with the purposes of the Act. The fact that the DCPC, in its efforts to preserve water quality, also justifiably preserves some land for affordable housing does not negate its validity. Summary judgment in favor of the plaintiffs was inappropriate.

b. *Boundaries of a DCPC.* The judge's conclusion that a DCPC, as matter of law, cannot be town wide is erroneous and may not constitute a basis for granting summary judgment in favor of the plaintiffs. There is nothing in the Act that states or implies that a DCPC cannot be town wide. The definition of a DCPC speaks to "a geographic area . . . requiring special protection." St. 1989, c. 716, § 2(*j*). If a municipality can demonstrate that the land within its boundaries requires that special protection, as the town did here, then a town-wide boundary for a DCPC is appropriate. Section 10(*c*) of the Act, discussed above, supports this conclusion, recognizing that resources shared by different communities may be treated differently in one area if the commission "makes a written finding that there are valid reasons based upon local differences and characteristics to justify treating them differently." The commission's decision to accept the Barnstable DCPC certainly includes those contemplated findings, explaining that the difference in treatment is due to (in simplified terms) the unique groundwater system and soils in Barnstable; the critical water supply and coastal embayments; and the population density, growth, and the existing and potential residential development in the town.

c. *Commission's motion for summary judgment.* The plaintiffs have conceded that "ground water is a natural resource within the meaning of [§] 10(*a*)(1)" of the Act. Their position was that there was no basis on this ground of the Barnstable DCPC, to designate the DCPC's borders town wide. For the reasons explained, there was a supported basis. The commission's motion for summary judgment should have been allowed.

5. The order allowing the plaintiffs' motion for summary judgment, and the declaration entered in the plaintiffs' favor, are vacated. The order denying the commission's motion for sum-

mary judgment is reversed. The commission's motion for summary judgment is allowed. A new declaration shall enter stating that the nomination and designation of the Barnstable DCPC was not improper under the Act.

*So ordered.*