442 Mass. 159 (2004)                                          159

Associated Subcontractors of Massachusetts, Inc. *v.* University of Massachusetts Building Authority.

ASSOCIATED SUBCONTRACTORS OF MASSACHUSETTS, INC., &
others[1] *vs.* UNIVERSITY OF MASSACHUSETTS BUILDING
AUTHORITY & another.[2]

Suffolk. April 5, 2004. - July 7, 2004.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Public Works,* Bidding procedure. *Contract,* Public works, Construction
contract, Bidding for contract. *University of Massachusetts. Practice, Civil,*
Standing. *Words,* "Funds," "Nongovernmental sources."

This court concluded that a group of subcontractors and an association of
   subcontractors had standing to challenge the defendant building authority's
   process for awarding a public construction project. [163-164]
In a civil action challenging the defendant building authority's undertaking of
   construction of a dormitory complex for the defendant university as viola-
   tive of the competitive bidding statute, G. L. c. 149, § 44F, the judge
   properly granted summary judgment in favor of the defendants on the
   ground that the construction project fell within the exemption provision of
   St. 1960, c. 773, § 18, as appearing in St. 1998, c. 319, § 15, where more
   than one-half of the project's cost was financed by student room and board
   fees, which constituted "nongovernmental sources" of "funds" for
   purposes of triggering the exemption provision; moreover, the Com-
   monwealth's guaranty of a bond issue did not transform the "nongovern-
   mental sources" into a governmental source of funds. [164-169]

CIVIL ACTION commenced in the Superior Court Department on
August 20, 2001.

The case was heard by *S. Jane Haggerty,* J., on motions for
summary judgment.

The Supreme Judicial Court granted an application for direct
appellate review.

*Peter J. Gagne* for the plaintiffs.

*Bruce W. Edmands* (*David B. Hobbie* with him) for University
of Massachusetts Building Authority.

[1]Montle Plumbing & Heating Co.; Norfolk Electric, Inc.; and Apex Corpora-
tion (collectively, plaintiffs or plaintiff subcontractors).

[2]University of Massachusetts (collectively, defendants).

*Geoffrey B. McCullough*, for University of Massachusetts, was present but did not argue.

MARSHALL, C.J. By statute, most public construction projects in the Commonwealth are subject to a statutory competitive bidding process. See G. L. c. 149, §§ 44A-44H (competitive bidding statute). There are, however, exceptions to the statutory bidding scheme, among them certain construction projects undertaken by the University of Massachusetts Building Authority (authority)[3] that are financed with funds "from nongovernmental sources." See St. 1960, c. 773, § 18, as appearing in St. 1998, c. 319, § 15 (exemption provision).[4] This case requires us to construe for the first time the phrase "funds . . . from nongovernmental sources," as used in the exemption provision.

The plaintiffs, subcontractors and an association of subcontractors, brought a declaratory judgment action in the Superior Court against the authority and the University of Massachusetts

___

[3]Since the creation of the University of Massachusetts Building Authority in 1960, its construction projects have been subject to the strictures of the competitive bidding law. St. 1960, c. 773, § 18 ("The provisions of . . . [G. L. c. 149, §§ 44A-44H], inclusive, . . . are hereby made applicable to the Authority"). The competitive bidding statute sets forth detailed requirements for public agencies that award building contracts estimated to cost more than $25,000. See G. L. c. 149, § 44A (2).

[4]The 1998 amendment states in relevant part: "The provisions of [§§ 26 to 29], inclusive, and of [§§ 44A to 44H], inclusive, of [G. L. c. 149], and [§§ 39F to 39P], inclusive, and [§ 39R] of [G. L. c. 30] are hereby made applicable to the authority. Notwithstanding the foregoing, for projects for which not less than one-half of the funds are from nongovernmental sources, with the approval of the governor, said authority may use an alternative mode of procurement of design and construction including, but not limited to, sequential, construction management, turnkey, design/build procurement and the phasing of such procurement including, but not limited to, approval of design and construction stages as separate or combined phases, which shall most efficiently, economically and best serve the interests of said authority. In all cases, said authority shall use procedures which shall be compatible with the policies and procedures for the selection of designers in [§§ 38A ½ to 38O], inclusive, of [G. L. c. 7] and with the policies and procedures for the selection of contractors in [§§ 44A to 44H], inclusive, of [G. L. c. 149] to the extent feasible in light of the mode selected." St. 1998, c. 319, § 15.

This provision was further amended in 2003 to exempt from the competitive bidding statute "certain projects at the Amherst campus designated by the president of the university and the chancellor of the Amherst campus pursuant to a two year pilot program for projects initiated in the 2004 and 2005 calendar years." St. 2003, c. 140, § 52.

442 Mass. 159 (2004) 161

Associated Subcontractors of Massachusetts, Inc. *v*. University of Massachusetts Building Authority.

(university). They claimed that the defendants undertook to construct a dormitory complex for the university in violation of the competitive bidding statute, in particular, G. L. c. 149, § 44F, mandating competitive bidding procedures for certain subcontracts for public construction projects. On cross motions for summary judgment, a judge in the Superior Court granted summary judgment for the defendants on the ground that the dormitory construction project fell within the exemption provision. We granted the plaintiffs' application for direct appellate review. We now affirm.

1. *Background.* The facts are undisputed. The plaintiff subcontractors regularly bid on and perform subcontract construction work for public agencies. The defendant authority is a "public instrumentality" created by the Legislature in 1960 to provide the university with dormitories, dining commons, and other structures. See St. 1960, c. 773, §§ 2-3. See also St. 1960, c. 773, § 4 (authority may construct, acquire, lease, and maintain buildings, grounds, and parking areas of university). The authority's activities are deemed "an essential governmental function." St. 1960, c. 773, § 2.

The Legislature has empowered the authority to borrow funds and issue bonds and notes, St. 1960, c. 773, § 4 (*g*), and to "fix, revise and collect fees, rents, rates and other charges for the use of, a project financed or refinanced" by it. St. 1960, c. 773, § 9, as appearing in St. 1963, c. 864, § 11. The authority is required to pay the principal and interest on any bonds issued to fund a construction project the authority undertakes. *Id.* The authority may also contract with the Commonwealth "for state financial assistance in the form of a guaranty by the commonwealth."[5] St. 1960, c. 773, § 10.

In November, 2000, the university proposed, and the

---

[5]Statute 1960, c. 773, § 10, as amended through St. 1999, c. 55, § 11, states: "The commonwealth, acting by and through the trustees, may enter into a contract or contracts with the Authority for state financial assistance in the form of a guaranty by the commonwealth of bonds of the Authority issued to achieve any of its corporate purposes or to refund outstanding indebtedness of the Authority incurred under this act or any other authority for any such purpose. . . .

"The guaranty of the commonwealth provided pursuant to such contract shall be of the payment of the principal of, and interest on, all such notes and

Secretary of Administration and Finance approved, a project to construct a dormitory complex at the university's Dartmouth campus, consisting of two residence halls to house 800 undergraduate and graduate students. To finance the project through the issuance of bonds and their guaranty by the Commonwealth, on December 1, 2000, the authority entered into an agreement, pursuant to St. 1960, c. 773, §§ 5 and 10, with the Commonwealth, and a separate agreement with a bond trustee, State Street Bank and Trust Company, pursuant to St. 1960, c. 773, § 8, to secure the payment of all amounts to become due on the bonds. Together, the agreements obligated the authority to construct the dormitory complex and the university to collect student room and board fees that it would then transmit, at the authority's direction, to the bond trustee for payment of the principal and interest on the bonds. On December 8, 2000, the authority adopted a bond resolution authorizing the issuance of facilities revenue bonds in the principal amount of $46,980,000 to finance the dormitory construction. See St. 1960, c. 773, § 7. On December 8, 2000, the authority also entered into an agreement with private investors to underwrite the bond issue.

Two weeks later, on December 21, 2000, the authority requested the Governor's approval to bypass the requirements of the competitive bidding statute in favor of employing an alternative procurement method. See St. 1960, c. 773, § 18, as appearing in St. 1998, c. 319, § 15. In support of its request, the authority stated that not less than one-half of the project cost would be "financed by fees for room and board paid by University students," thus bringing the project within the ambit of the exemption provision. See *id.* On February 13, 2001, the Governor approved the authority's request, agreeing that the student room and board fees used to fund the construction were "funds . . . from nongovernmental sources" pursuant to the exemption provision. The authority then elected to build the

bonds as the same become due and payable, and the full faith and credit of the commonwealth is hereby pledged for any such guaranty; provided, that the total amount of notes and bonds so guaranteed and outstanding at any one time shall not exceed 200 million dollars in the aggregate, exclusive of bonds and notes refunded or being refunded thereby."

442 Mass. 159 (2004) 163

Associated Subcontractors of Massachusetts, Inc. *v.* University of Massachusetts Building Authority.

dormitory complex under a construction manager-at-risk contract.[6] With this background, we turn to the plaintiffs' case.

2. *Standing.* We first consider the defendants' threshold challenge to the plaintiffs' standing. The defendants claim that the authority's enabling act provides no mechanism for contractors to sue the authority. Their argument overlooks that the provisions of the competitive bidding statute clearly apply to all nonexempt authority projects, and that private parties may bring suit to enforce the provisions of the competitive bidding statute. See G. L. c. 149, § 44H (describing enforcement mechanism); *Norfolk Elec., Inc.* v. *Fall River Hous. Auth.*, 417 Mass. 207, 210-211 (1994) (in declaratory judgment action where parties have stipulated to facts, question one of law and matter public interest, which affects right of subcontractors beyond those involved in present controversy, court may exercise jurisdiction "despite a plaintiff's failure to exhaust administrative remedies" of G. L. c. 149). While it is undisputed that none of the plaintiffs submitted proposals to the authority with respect to the construction project, we have long held that a subcontractor who has the right to be considered a subbidder on such a project has standing to challenge the award of a contract alleged to violate the statutory competitive bidding requirements. The plaintiffs "need not meet rigid 'but for' standing requirements by asserting that if there had been compliance with the statute, they certainly would have been awarded the contract." *Modern Cont. Constr. Co.* v. *Lowell*, 391 Mass. 829, 835 (1984). For purposes of standing, they need only allege, as they have in this case, that they are persons or entities "who were illegally prevented" from becoming bidders. *John T. Callahan & Sons* v. *Malden*, 430 Mass. 124, 129 (1999), quoting *Doric Bldg. Assocs.* v.

---

[6]In an affidavit submitted with the defendants' motion for summary judgment, the executive director of the authority, Joseph G. Brady, described construction manager-at-risk contracts as "characterized by a contract between an owner and a construction manager pursuant to which the construction manager assumes responsibility for handling all of the details of the project for a guaranteed maximum price above which the owner is not liable for payment." In the affidavit, Brady also explains that "[t]he Authority's decision to employ a Construction Manager-at-Risk [contract] was based on a growing body of evidence, developed and shared by independent experts and government officials, that use of procurement procedures dictated by [G. L. c. 149] contribute substantially to project cost overruns and delays."

164      442 Mass. 159 (2004)

Associated Subcontractors of Massachusetts, Inc. *v.* University of Massachusetts Building Authority.

*Department of Labor & Indus.*, 27 Mass. App. Ct. 1175, 1177 (1989). See *Norfolk Elec., Inc.* v. *Fall River Hous. Auth., supra* at 208 n.2. "If the situation were otherwise, the important role played by individual bidders in securing compliance with the bidding statutes and legislative policy objectives would be diminished." *Modern Cont. Constr. Co.* v. *Lowell, supra* at 836.

The association similarly has standing in this case because its members, the subcontractors, have standing to bring this suit, the issues are germane to the association's purpose, and the claim is one for declaratory judgment. See *Modified Motorcycle Ass'n of Mass.* v. *Commonwealth*, 60 Mass. App. Ct. 83, 85 n.6 (2003), citing *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). We turn now to the merits.

3. *Statutory analysis.* We have not previously had occasion to construe the phrase at the heart of this controversy: whether the funding scheme for the dormitory project employs "funds" "from nongovernmental sources," St. 1998, c. 319, § 15, so as to trigger the exemption provision. As always, our analysis begins with the statutory language, "the principal source of insight into Legislative purpose." *Commonwealth* v. *Lightfoot*, 391 Mass. 718, 720 (1984).

The Legislature has not defined "nongovernmental sources" in the authority's enabling act, and the term appears nowhere else in the statute. Because the statutory language is not conclusive, we "turn to extrinsic sources, including the legislative history and other statutes, for assistance in our interpretation." *Chandler* v. *County Comm'rs of Nantucket County*, 437 Mass. 430, 435 (2002), citing *EMC Corp.* v. *Commissioner of Revenue*, 433 Mass. 568, 570-571 & nn.6-8 (2001) (other statutes) and *Barclay* v. *DeVeau*, 384 Mass. 676, 680 (1981) (legislative history).

Our analysis of the authority's enabling statute belies the merits of the plaintiffs' claim that funding for the dormitory complex comes from governmental sources. The Legislature enacted the competitive bidding statute "to ensure that the awarding authority obtain the lowest price among responsible contractors," *Modern Cont. Constr. Co.* v. *Lowell, supra* at 840, "to establish an open and honest procedure for competition for public contracts," *id.*, and to "facilitate[] the elimination of

favoritism and corruption as factors in the awarding of public contracts." *Interstate Eng'g Corp.* v. *Fitchburg*, 367 Mass. 751, 758 (1975). Nevertheless, the Legislature has also recognized that the competitive bidding statute may contribute to inefficiency and delay in completing certain public construction projects. See Final Report to the General Court of the Special Commission Concerning State and County Buildings at 289 (1980) (present law "fails to serve the best interests of the public and fails to achieve its ostensible purposes"); Construction Reform Task Force, Final Report at 13 (1998) (recommending that legislative authorization be sought to allow certain authorities to use alternative project delivery methods).[7] See also D. Gransberg, The Cost of Inaction: Does Massachusetts Need Public Construction Reform? at 18 (1999) ("the data support the assertion that the net effect of restrictive procurement legislation is to increase both the cost and the time it takes to deliver a public facility"). The 1998 report considered several alternatives to the "design-bid-build" method of construction delivery mandated under the competitive bidding statute.[8] Among the alternatives considered was the use of construction manager-at-risk contracts. Construction Reform Task Force, Final Report, *supra.* That same year, 1998, the Legislature amended the authority's enabling act by exempting from the strictures of the competitive bidding statute, on the approval of the Governor, "projects for which not less than one-half of the funds are from nongovernmental sources."[9] St. 1998, c. 319, § 15. The exemption provision permits the authority to elect such alternative procurement methods in the design and

[7]The construction reform task force was established in November, 1997 by the Secretary of Administration and Finance to review existing agency practices with regard to public construction procurement and management.

[8]Under the design-bid-build method, "the owner retains an engineer or an architect on a separate contract to complete the design of the public facility. Once design is final, a set of plans, specifications, and contract boilerplate is advertised for bid by the construction industry. Construction contractors submit a price, and the project is awarded to the lowest responsive and responsible bidder." D. Gransberg, The Cost of Inaction: Does Massachusetts Need Public Construction Reform? at 3 (1999).

[9]The legislative history does not expressly indicate that St. 1998, c. 319, § 15, was a specific legislative recommendation of the construction reform task force, although the task force did recommend that authorities be allowed "to use alternative delivery and procurement methods for projects that meet

construction phases of a project as "shall most efficiently, economically and best serve the interests of said authority."[10] *Id.*

The plaintiffs argue that, separately and jointly, the use of student fees to repay the bond obligation for the dormitory construction and the Commonwealth's guaranty of the bond issue comprise "funds" from governmental sources that keep the dormitory project within the purview of the competitive bidding statute. We disagree. The plaintiffs argue that "[t]he source of the Project funding was the bond itself." That assertion is incorrect. The Legislature distinguished between "funds" and "revenues" on the one hand, and "proceeds" on the other. "Funds" and "revenue" refer to the revenue stream dedicated to the payment of principal and interest of any bonds. See, e.g., St. 1960, c. 773, § 7, as amended through St. 1998, c. 319, § 13 ("The principal and interest of any bonds or notes issued hereunder shall be payable solely from the funds herein provided for such payment"); St. 1960, c. 773, § 9, as appearing in St. 1963, c. 684, § 11 ("revenues sufficient . . . to pay the principal of and interest on bonds issued to finance or refinance such projects"; "[a]ll revenues derived from projects and property . . ."). Potential sources of "revenue" or "funds" for projects include appropriations by the Commonwealth, St. 1960, c. 773, § 19A, inserted by St. 1963, c. 684, § 15; revenue from the university, St. 1960, c. 773, § 9; grants from the Federal government, St. 1960, c. 773, § 4 (l); private donations, *id.*; and, as is the case here, student fees. St. 1960, c. 773, § 9.

In contrast, the term "proceeds" refers to the money generated by the issuance of any bonds. See, e.g., St. 1960, c. 773, § 7, as amended ("The proceeds of such bonds and notes shall be used solely for the purposes for which they are issued"; "[i]f the proceeds of bonds or notes issued in whole or in part

---

certain criteria." Construction Reform Task Force, Final Report at B-16 (1998).

[10]Although it permits the authority to obtain an exemption from strict adherence to the competitive bidding statute, the exemption provision also states: "In all cases, said authority shall use procedures which shall be compatible . . . with the policies and procedures for the selection of contractors in [G. L. c. 149, §§ 44A-44H] to the extent feasible in light of the mode selected." St. 1998, c. 319, § 15.

to pay the cost of a project . . . shall be less than such cost, additional bonds or notes may in like manner be issued to provide the amount of such deficit"; "[i]f the proceeds of an issue or series of bonds or notes shall exceed the cost of the projects they were issued to finance the surplus shall be deposited for application to the retirement thereof"). In short, "funds," including those from "nongovernmental sources" such as "student fees," refers to the revenue stream pledged "to pay the principal of and interest on bonds issued to finance or refinance such projects," St. 1960, c. 773, § 9, as appearing in St. 1963, c. 684, § 11, and not, as the plaintiffs urge, the "proceeds" from the authority's sale of a bond. See *Commonwealth* v. *Mercy Hosp.*, 364 Mass. 515, 520 (1974) ("The Legislature is presumed to use a term in the sense in which it has been used before in the same context").

We have no doubt that the specific student room and board fees at issue in this case are "nongovernmental sources" of "funds" for purposes of triggering the exemption provision. The student room and board fees originate with private individuals who desire to reside in university housing.[11] Cf. *Ayer* v. *Commissioner of Admin.*, 340 Mass. 586, 594 (1960) (holding nonprofit corporation established to build State office building not distinct from the Commonwealth where rental payments by Commonwealth "in practical effect are instalment payments on account of a purchase by the Commonwealth of an office

---

[11]The plaintiffs argue that, because the function of the authority is governmental and the purpose for which the fees are assessed is public, the fees are governmental. But such a reading would violate a basic tenet of statutory construction by rendering the term "funds . . . from nongovernmental sources" devoid of any import. See *Bankers Life & Cas. Co.* v. *Commissioner of Ins.*, 427 Mass. 136, 140 (1998), quoting 2A B. Singer, Sutherland Statutory Construction § 46.06 (5th ed. 1992) ("a statute must be construed 'so that effect is given to all its provisions, so that no part will be inoperative or superfluous' "); *Commonwealth* v. *Mercy Hosp.*, 364 Mass. 515, 521 (1974) ("it is our task to construe the statute in such a way as to make it an effective piece of legislation . . . and in that connection every phrase should be given some effect" [citations omitted]). Under that analysis, all of the authority's construction projects would be deemed governmental. Indeed, the enabling act, stating that the authority's activities are "an essential governmental function," St. 1960, c. 773, § 2, would demand such a conclusion. But the statute directs us to examine neither the function of the authority nor the purpose of the building, and we must, as the statute demands, examine only the source of the funds.

building"). The fees are assessed by the authority to pay the cost of providing that housing. St. 1960, c. 773, § 9. They are collected by the university and paid directly to the bond trustee to pay the principal and interest of the bonds. St. 1960, c. 773, § 8, as amended by St. 1963, c. 684, § 11 ("Bonds issued under the provisions of this act shall be secured by a trust agreement by and between the Authority and a trustee"). St. 1960, c. 773, § 12, as amended by St. 1963, c. 684, § 12 ("All moneys received pursuant to the authority of this act, whether as proceeds from the sale of notes or bonds or otherwise, shall be deemed to be trust funds to be held and applied solely as provided in this act"). The fees do not become a part of the Commonwealth's General Fund, see *id.*, and no further act of the Legislature is necessary for the authority to assess such fees. St. 1960, c. 773, § 9, as appearing in St. 1963, c. 684, § 11 ("The Authority is hereby authorized . . . to fix, revise and collect fees, rents, rates and other charges for use of, a project . . ."). See G. L. c. 3, § 39 (defining term "[a]uthority" as "any public instrumentality of the commonwealth which is not subject to the supervision and control of either the legislative, executive or judicial departments of state government . . . and which does not receive state appropriations either for operations or the payment of debt obligations"). Most importantly, none of the funds for this project was raised by State, local, or Federal taxation. See *Opinion of the Justices*, 354 Mass. 779, 784 (1968) (" 'Public money' is money raised by taxation"). No governmental appropriation was made for the project.[12] Cf. G. L. c. 75, § 8 (providing for annual appropriation to university). We conclude that the student room and board fees at issue are "funds . . . from nongovernmental sources," thereby exempting the dormitory construction project from the competitive bidding statute.

We are similarly persuaded that the Commonwealth's guaranty of the bond issue does not transform the "nongovern-

[12]The defendants aver, and the plaintiffs do not dispute, that the authority did not receive any appropriation from the Legislature for the project, nor did it receive any other monies from the Commonwealth, the Commonwealth's treasury, or the university, except those authority revenues collected by the university from students occupying the dormitories — the student room and board fees.

mental sources" used to fund the dormitory project into a "governmental" source of funds. The primary purpose of the guaranty, and its principal effect, is to enable the bonds to be sold at a lower interest rate, thereby reducing the authority's costs. That purpose aligns squarely with the intention of the exemption provision that the authority choose procurement methods that "most efficiently, economically and best serve [its] interests." St. 1998, c. 319, § 15. To require that the authority forgo a cost-saving device, the Commonwealth's guaranty, in order to make use of a cost-saving method of construction would be to disable the exemption provision, in contravention of the Legislature's intent. Moreover, we note that the guaranty does not require the Commonwealth to appropriate any funds, and the Commonwealth has not done so here.[13] Nor does the guaranty require or permit the Commonwealth to pay the cost of dormitory construction. It only secures to bondholders the payment of principal and interest. St. 1960, c. 773, § 10 ("The guaranty of the commonwealth provided pursuant to such contract shall be of the payment of the principal of, and interest on, all such notes and bonds as the same become due and payable . . ."). We discern no reason to conclude that the Commonwealth's guaranty of the authority's bonds in this case renders the source of funds for the dormitory construction project "governmental."

4. *Conclusion.* For the above reasons, we find no error in the Superior Court judge's grant of summary judgment for the defendants.

*Judgment affirmed.*

---

[13]The contract between the authority and the Commonwealth acting through the university trustees states, in part: "All Revenues collected or received by the Commonwealth or the University, from whatever source, shall be collected or received for the account of the Authority in trust to be held and applied solely as provided in the Enabling Act and, subject thereto, in this Contract, the resolution of the Authority authorizing the issue of the Bonds or the Trust Agreement, and the Authority may assign to the Bond Trustee its rights to receive such moneys. Such Revenues while held by the Commonwealth or the University shall be held separately from all other moneys of the Commonwealth, the University and the Authority."