Brassard, Raymond J., J.
INTRODUCTION
In this action for declaratory and injunctive relief, the Boston Police Patrolmen’s Association (“BPPA”) and ten registered voters seek to enjoin the City of Boston and the state Human Resources Division from transferring Boston Municipal Police Department patrol officers into the Boston Police Department pursuant to G.L.c. 31, §35. This matter is before the court on the plaintiffs’ motion for a preliminary injunction pursuant to Mass.R.Civ.P. 65. For the reasons discussed below, the plaintiffs’ motion is DENIED.
BACKGROUND[3]
The BPPA is a labor organization which is the exclusive bargaining agent for all police officers employed by the City of Boston Police Department (“BPD”) except for detectives and officers of the rank sergeant and above. Each of the individual plaintiffs is a Boston Police Officer and a resident of the City. The appointing authority for the BPD is the Police Commissioner, Ed Davis. There are two procedures by which a civil service police department such as BPD may hire individuals for the rank of police officer: by original appointment under G.L.c. 31, §§1 and 6 or by transfer under G.L.c. 31, §35.[4] Since 1986, the policy of the BPD has been not to approve police officer transfers into the BPD, so that the only method by which police officers have been hired into the BPD is by original appointment, which requires taking and scoring well on a biannual competitive civil service exam. All sworn members of the BPD were hired through the statutory original appointment process set forth in G.L.c. 31, §6. Individuals serving in other police departments who desired to become BPD officers have done so through the original appointment process, and their date of appointment is their date of hire with the BPD, regardless of their previous service as a police officer with another department.
The Human Resources Division (“HRD”) is an instrumentality of the state which administers the civil service laws of the Commonwealth as set forth in General Laws Chapter 31. The Chief Human Resources Officer must approve all appointments, promotions, and transfers to civil service positions within the Commonwealth. When original appointments are made to the BPD, the BPD Director of Human Resources requests a general certification list from HRD listing eligible individuals by rank in accordance with exam scores and statutoxy preferences. BPD considers each candidate on the list, in the order of ranking, and each candidate must undergo a thorough screening process which includes psychological testing, a medical evaluation, and background investigation. Each *73 candidate who makes it through this screening process and is appointed as a BPD officer must successfully complete the BPD police academy, a 28-week, 800-hour course of instruction. Pursuant to G.L.c. 31, §34, BPD patrol officers serve a one-year probationary period prior to attaining tenure as a BPD officer.
The City established the Boston Municipal Police Department (“BMPD”) in 1979 to serve as a security force for properties owned and controlled by the City. There are two sections within the BMPD. Site officers, who are unarmed, are assigned to patrol and secure a particular city facility. Patrol officers, who are armed, exercise limited police powers delegated to them by the BPD Commissioner under Rule 400A of the BPD Rules and Procedures governing Special Officers. In some respects the powers of BMPD patrol officers are comparable to those of BPD officers, but BMPD patrol officers have limited jurisdiction to patrol and secure properties owned by the City and do not have police powers afforded to BPD officers under G.L.chapter 90. BMPD patrol officers wear uniforms (different from BPD uniforms); carry batons, flashlights, mace, and weapons; transport their own prisoners; have the power to make arrests; and are qualified to testify in court. However, BMPD patrol officers do not have authority over motor vehicle violations and cannot obtain warrants. In any situation where both BMPD and BPD officers are present at a crime scene, the BPD officers have authority over the scene and the BMPD officer, regardless of rank, must defer to the BPD officer.
For the first 15 years of its existence, BMPD was a division of the City’s Public Facilities Department, a department which was exempt from the civil service laws. In 1994, the City moved the BMPD to the City’s Property and Construction Management Department, which is a civil service department. At that point, Property Department Deputy Commissioner Stephen Crosby, who is not a police officer, became the BMPD’s Appointing Authority. Prior to 1997, the process for becoming a BMPD site officer was informal. One interested in the job simply filled out an application and attended an interview. Officers were selected from a list of people who passed the interview and a criminal background check. In 1997, BMPD began giving a non-civil service examination, developed and administered by a private company, to new applicants for the site officer position. Existing site officers were not tested. The examination was given four times between 1997 and 2001, and the percentage of applicants who passed each time was around 53%. Notwithstanding this low passage rate, the private company which administered the test suggested to the BMPD that the department was using an inappropriately low passing score. The BMPD did not necessarily hire site officers in the order of their exam score. Out of the approximately 65 BMPD patrol officers today, only 13 passed this site officer exam.
The BMPD has never utilized an examination for promotion to the rank of patrol officer. Rather, after a six-to eight-month probationary period, individuals hired as site officers were able to fill out an application to become BMPD police officers. Site officers were selected for promotion to patrol officer based on their past performance, attendance, disciplinary record, a one-page narrative, and after taking a physical aptitude test and undergoing a background check. The officers selected attended a Massachusetts criminal justice certified police academy, although not necessarily the BPD academy, for an average of 16 weeks. The officers then became probationary BMPD patrol officers and attended a 45-day field training. Patrol officers remained on probationary status for one year from their date of initial hire with the BMPD, which included any time spent as a site officer. No separate probationary period applied to the position of BMPD patrol officer.
All BMPD patrol officers have attained permanent civil service status. In response to a request for a home rule petition filed by the Boston City Council, on August 10, 1998, the Legislature enacted St. 1998, c. 282, which provides:
Notwithstanding the provisions of any general or special law to the contrary, the personnel administrator shall certify any active employee who served in a civil service position in the city of Boston as a provisional or provisional promotion employee for a period of at least six months immediately prior to January 1, 1998, to permanent civil status in that position.
Chapter 282 was intended to provide relief to some 3,000 civil service employees languishing in provisional status, largely because HRD had failed to develop a competitive exam for their positions. In an August 26, 1999 investigative report, the Civil Service Commission concluded that BMPD patrol officers perform police functions. On December 24, 1999, HRD concluded that BMPD patrol officers were subject to civil service. However, even after that determination, several BMPD patrol officers were hired under the existing non-civil service procedures. On May 13, 2002, HRD provided the City with a list of employees certified as permanent under Chapter 282, including 53 BMPD patrol officers.
In 2003, the Civil Service Commission issued a decision recognizing BMPD patrol officers as civil service police officers. On June 26, 2003, the Civil Service Commission established new civil service classifications entitled “Boston Municipal Police Officer,” “Boston Municipal Police Sergeant,” and “Boston Municipal Police Lieutenant.” Accordingly, since 2003, BMPD has been required to hire new officers pursuant to the Chapter 31 procedures of original appointment under §6 or by transfer from another civil service department under §35. However, BMPD has not hired any new patrol officers since April of2001. At all times *74 prior to 2003, the City treated BMPD hires and promotions as non-civil service matters, and BMPD patrol officers were not required to take any civil service examination. Thus, none of the current BMPD patrol officers took a competitive civil service examination in order to be hired.
The City of Boston has made a determination to abolish the armed section of the BMPD, eliminating the titles of “Boston Municipal Police Officer,” “Boston Municipal Police Sergeant,” and “Boston Municipal Police Lieutenant.” Employees occupying those titles will be laid off effective December 31, 2006, unless they are eligible to transfer to the BPD pursuant to G.L.c. 31, §35. The Properly & Construction Management Department budget for fiscal year 2007 does not provide for BMPD armed patrol officers and superior officers after December 31. The City estimates that there will be $2,083,912 in salary savings as a result of the elimination of these positions. The abolition of the armed portion of the BPMD will further benefit the public by resulting in a unified command, with efficiencies in terms of the deployment of officers and administrative support services. Currently, the BMPD and BPD have separate rank structures, separate collective bargaining representatives, separate facilities, equipment and administrative staff, and separate radio systems, call-takers and dispatchers. At a May 23, 2006 Boston City Council meeting, BPD administrators testified that BPD will spend approximately $10,800 per BMPD patrol officer transferred, which includes the cost of outfitting and training. On July 3, 2006, the City Office of Labor Relations sent a letter to the BPPA which stated in relevant part:
The City has determined that the most effective means of providing police protection for the City of Boston is through a single police department. Accordingly, the City intends to abolish the armed portion of the Municipal Police Department (“MPD”) on or before December 31, 2006. It is contemplated that effective January 1, 2007, the Property management Department will deploy an unarmed security force for City buildings and property.
In early 2006, 23 individuals who became BMPD patrol officers between January 1, 1999 and December 3, 2001 filed an action with the Civil Service Commission (“the Commission”) requesting that the Commission use its equitable powers under Chapter 310 of the Acts of 1993 (“Chapter 310”) to grant them permanent civil service status.[5] Chapter 310 provides:
If the rights of any person acquired under the provisions of chapter thiriy-one of the General Laws or under any rule made thereunder have been prejudiced through no fault of his own, the civil service commission may take such action as will restore or protect such rights, notwithstanding the failure of any person to comply with any requirement of said chapter thirty-one or any such rule as a condition precedent to the restoration or protection of such rights.
The Commission allowed the BPPA to intervene in that action in order to oppose the granting of permanent civil service status to the BMPD patrol officers. In a decision dated October 27, 2006, the Commission granted permanent civil service status to these 23 BMPD patrol officers. On November 3, 2006, the BPPA appealed that decision to the Superior Court pursuant to G.L.c. 30A, §14.[6]
On November 17, 2006, the City notified BMPD patrol officers and superior officers of its intent to lay them off effective December 31, 2006 pursuant to G.L.c. 31, §39 and held hearings. The City has engaged in impact bargaining with the Boston Municipal Police Patrolmen’s Association and the Boston Municipal Police Superior Officers Association, and has offered to engage in such bargaining with the four unions that represent BPD personnel, but those unions have declined to bargain.
The BPD has applied a rigorous screening process to those BMPD patrol officers who have applied for §35 transfer, the same process it applies to candidates processed from a civil service certification. Initially, 64 BMPD patrol officers applied for transfer. The applicants were put through a thorough background investigation by the Recruit Investigations Unit, including completion of a standard recruit officer application, criminal history review, neighbor and employer assessments, driving record history review, employment history review, and attendance history. Following this review, only 49 BMPD patrol officers proceeded to the next stage of the hiring process and received a conditional employment offer from the BPD. They were then submitted to a medical screening process which includes a physical examination, a written psychological exam, an oral psychological interview, hair drug testing, illegal steroid testing, and filling out a medical questionnaire. Following this process, there were 39 applicants left, only 33 of whom passed a physical abilities test.
Each of the 33 BMPD patrol officers currently eligible for transfer must show that they attended and successfully completed a Municipal Police Training Committee approved academy. If they cannot do that, they will have to attend and successfully complete the Boston Police Academy in full. Upon acceptance into the BPD in January of 2007, they will undergo extensive in-service training to familiarize them with BPD procedures, rules, and regulations. In addition, they will have to take an assessment exam in January 2007 to determine which, if any, refresher courses on basic policing topics are necessary. Each of these 33 BMPD patrol officers has at some point in his career taken and passed the Commonwealth’s competitive civil service exam for police officers. Each officer took the exam in connection with a desire to transfer out of the BMPD into a civil service police department elsewhere in the *75 state, and not in connection with their hire into the BMPD. If transfer is not an option, these 33 BMPD patrol officers will be laid off, with the highest paid individual eligible for $406 in weekly unemployment compensation benefits for 30 weeks. The laid off officers will have to pay 100% of the premium to continue their group health insurance: $459 per month for individual and $1,237.20 per month for family coverage.
The BPD requires more police officers and has publicly announced the goal of hiring 140 additional police officers by June 30, 2007. Because of the extensive screening and training associated with the civil service hiring process, none of the individuals chosen off of the certification list will be available for full duty as police officers for approximately a year and a half. The 33 BMPD patrol officers who are being considered for transfer into the BPD will be ready for patrol in approximately four months.
The BPPA filed this action on July 11,2006, seeking to prevent the transfer of BMPD patrol officers to the BPD. Count I of the complaint seeks a declaratory judgment that the proposed transfer would violate G.L.c. 31, §35. Count II states a ten taxpayer suit for relief. The defendants responded by filing motions to dismiss the complaint pursuant to Mass.R.Civ.P. 12(b). A hearing on these motions to dismiss is scheduled for March 5, 2007.
BPPA filed this motion for a preliminary injunction on December 1, 2006. At a hearing on the injunction on December 13, 2006, this Court allowed the motion of the Boston Police Superior Officers Federation to intervene in this case, as well as the motion to intervene of the Boston Municipal Police Patrolmen’s Association. At a further hearing on December 15, counsel for the Boston Municipal Police Patrolmen’s Association advised the court that all of the BMPD patrol officers intended to file, later that day, requests for voluntary transfer under the last paragraph of G.L.c. 31, §35.
DISCUSSION
When a suit is brought either by the government or a private citizen acting as a private attorney general to enforce a statute or declared policy of the Legislature, irreparable harm is not required. LeClair v. Town of Norwell, 430 Mass. 328, 331 (1999). The court must determine whether there is a likelihood of success on the merits and then determine whether the requested order promotes the public interest or alternatively, that the equitable relief will not adversely affect the public. Local Order of Moose, Inc., Yarmouth Lodge #2270 v. Board of Health of Yarmouth, 439 Mass. 597, 601 (2003); LeClair v. Town of Norwell, 430 Mass. at 332. Where a statutory violation is alleged, the court should consider how such violations affect the public interest, keeping in mind the express purposes of the violated statute. LeClair v. Town of Norwell 430 Mass. at 332, 337; Edwards v. Boston, 408 Mass. 643, 647 (1990).
I. LIKELIHOOD OF SUCCESS ON THE MERITS
As noted supra, the defendants have filed motions to dismiss this action pursuant to Mass.R.Civ.P. 12(b)(1) which raise serious questions of whether this Court has subject matter jurisdiction over this case. Accordingly, although the hearing on that matter is not scheduled until March of 2007, this Court must address the issues raised in the motions to dismiss insofar as they impact the BPPA’s likelihood of success on the merits. To secure declaratory relief in a case involving administrative action, a plaintiff must show that there is an actual controversy, he has standing to bring the suit, all necessary parties have been joined, and available administrativé remedies have been exhausted. Naranjo v. Department of Revenue, 63 Mass.App.Ct. 260, 267 (2005). The defendants contend that because the BPPA cannot meet any of these requirements, this Court lacks subject matter jurisdiction to entertain this action. See Ginther v. Commissioner of Ins., 427 Mass. 319, 322 (1998) (plaintiffs’ standing to bring suit is issue of subject matter jurisdiction); Leahy v. Local 1526, 399 Mass. 341, 345 (1987) (prior resort and exhaustion of administrative remedies doctrines implicate court’s jurisdiction to decide matter).
A. Actual Controversy
The defendants first argue that the plaintiffs have no likelihood of succeeding in their declaratory judgment action because no actual controversy exists under Chapter 231 A. The statutory actual controversy requirement is to be liberally construed, and a party seeking a declaratory judgment need not demonstrate an actual impairment of rights. Boston v. Keene Corp., 406 Mass. 301, 304 (1989); Colby v. Commissioner of Pub. Welfare, 18 Mass.App.Ct. 767, 773 (1984), rev. den., 393 Mass. 1105 (1985). The purpose of Chapter 231A is to afford relief from uncertainty and insecurity with respect to rights, duties, status, and other legal relations. Boston v. Keene Corp., 406 Mass. at 304-05. In addition, there is a measure of discretion in deciding whether a case is appropriate for declaratory relief. Id. at 305 (constitutionality of legislation establishing statute of limitations for asbestos claim presented actual case or controversy, even though it was not yet clear whether it applied to plaintiffs’ claims, because issue was one of considerable importance concerning matters of public health and safety).
The defendants contend that there is no actual controversy because as of the date of the preliminary injunction hearing, HRD had not yet taken any action with respect to a transfer under G.L.c. 31, §35. Declaratory relief has been refused where it has been sought to determine the validity or possible effect of future acts of a public entity. Bob Ware’s Food Shops, Inc. v. Brookline, 349 Mass. 385, 389 (1965). See, e.g., Samuels Pharmacy, Inc. v. Board of Registration in Phar *76 macy, 390 Mass. 583, 591-92 (1983) (no case or controversy concerning whether disciplinary board could properly use certain evidence seized by police, where board had not yet made a final determination whether it intended to use it). However, it is not necessary that the parties be irrevocably bound to a course of action before a court can afford declaratory relief. Oxford v. Oxford Water Co., 391 Mass. 581, 584 (1984) (town entitled to declaratory relief concerning its authority to effect a taking of certain property before town actually did so). An actual controversy exists where there is a dispute over rights and obligations in circumstances indicating that the failure to resolve the conflict will almost inevitably lead to litigation. Boston v. Keene Corp., 406 Mass. at 304; Colby v. Commissioner of Pub. Welfare, 18 Mass.App.Ct. at 773. Here, it seems clear from the materials submitted that the City has asserted its intention to transfer current BMPD police officers into the BPD by December 30, 2006 and has taken concrete steps to effectuate such a transfer. The expressed December 30 deadline is imminent. There is a genuine dispute between the plaintiffs and the City and State defendants as to whether such a transfer is permissible under G.L.c. 31, §35. The plaintiffs have stated more than conclusoiy allegations concerning a potential future conflict, and there is a real, not hypothetical, controversy. Penal Inst. Comm’r for Suffolk County v. Commissioner of Corr., 382 Mass. 527, 531 (1981). In addition, the necessary and relevant facts appear to be before the court and are largely undisputed. Cf. Gay & Lesbian Advocates & Defenders v. Attorney General, 436 Mass. 132, 135-36 (2002) (no case or controversy concerning whether criminal statute violated plaintiffs’ privacy and other constitutional rights, where no criminal charges were pending against plaintiffs and facts underlying potential charges were not disclosed with sufficient particularity for court to rule). Under these circumstances, there is an actual case or controversy for purposes of Chapter 231A, and the BPPA’s complaint is not dismissible on that ground.
B. Standing
The defendants further contend that even if there is an actual controversy, the BPPA lacks standing to seek a declaratory judgment under Chapter 231A. The plaintiff in a declaratory judgment action must be one who by virtue of a legally cognizable injury is entitled to initiate judicial resolution of the controversy through the issuance of a declaration. Massachusetts Assoc. of Ind. Ins. Agents and Brokers, Inc. v. Commissioner of Ins., 373 Mass. 290, 293 (1977). Standing requirements should be liberally construed in declaratory judgment proceedings. Home Builders Assoc. of Cape Cod Inc. v. Cape Cod Comm’n, 441 Mass. 724, 733 (2004). However, Chapter 231A does not provide an independent basis for standing. Enos v. Secretary of Envtl. Affairs, 432 Mass. 132, 135 (2000). In order for an association such as BPPA to have representational standing to sue on behalf of its members, the test is whether any individual member could demonstrate that he has suffered a legally cognizable injury, whether the interests the BPPA seeks to protect are germane to its organizational purpose, and that neither the claim asserted nor the relief requested requires the participation of individual members in the suit. Association Subcontractors of Massachusetts, Inc. v. University of Massachusetts Building Auth, 442 Mass. 159, 163 (2004); Massachusetts Ass’n of Cosmetology Schools, Inc. v. Board of Registration in Cosmetology, 40 Mass.App.Ct. 706, 708 (1996). To have standing, an individual plaintiff must show substantial injury as a result of the action complained of, and the injury must fall within the area or concern of the statute or regulatory scheme under which the injurious action has occurred. Ginther v. Commissioner of Ins., 427 Mass. at 323; Massachusetts Assoc. of Ind. Ins. Agents and Brokers, Inc. v. Commissioner of Ins., 373 Mass. at 293. A plaintiff must show not only injury but also a breach of a duty owed to it by a public defendant. Northbridge v. Natick, 394 Mass. 70, 75 (1985). In determining whether standing exists, the court should examine the language of the statute at issue, the nature of the administrative scheme, any adverse effects that might occur if standing is recognized, and the availability of other more definite remedies to the plaintiffs. Enos v. Secretary of Envtl. Affairs, 432 Mass. at 135-36.
The purpose of the civil service system is to guard against political considerations, favoritism and bias in government employment decisions and to foster the selection of public employees of skill and integrity. Massachusetts Assoc. of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 259 (2001); Cambridge v. Civil Service Comm’n, 43 Mass.App.Ct. 300, 305, rev. den., 426 Mass. 1102 (1997). The centerpiece of the statutory scheme is hiring and promotion based on “basic merit principles” as defined in G.L.c. 31, §1. Massachusetts Assoc. of Minority Law Enforcement Officers v. Abban, 434 Mass. at 259. To that end, Chapter 31, section 2 allows ten registered voters to request in writing that the Civil Service Commission conduct an investigation of civil service violations. In addition, section 2 authorizes appeals by a person aggrieved by any decision, action, or failure to act by the administrator. A person is aggrieved under section 2 if he alleges that:
a decision, action, or failure to act on the part of the administrator was in violation of this chapter, the rules or basic merit principles promulgated thereunder and said allegations shall show that such person’s rights were abridged, denied, or prejudiced in such a manner as to cause actual harm to the person’s employment status.
G.L.c. 31, §2. Section 35, the transfer provision at issue in this case, provides in relevant part that “[a] person who is aggrieved by a transfer . . . made pursuant to this section . . . may appeal to the commis *77 sion pursuant to the provisions of section forty-three . . .” The defendants argue that the BPPA cannot show that the transfer of BMPD officers into the BPD will harm the employment status of existing BPD officers. However, the plaintiffs assert that they will be harmed by having to work alongside individuals who did not obtain their jobs through the statutory competitive scheme designed to advance basic merit principles, and who may not have adequate credentials and abilities for the position of BPD officer. In addition, the individual plaintiffs will have to compete with such individuals for promotions, overtime, and detail opportunities. The BPPA also seeks to vindicate the public interest in enforcement of the civil service laws. This is direct harm within the area of concern of Chapter 31 sufficient to give the plaintiffs standing under Chapter 231A to challenge the impending transfer. See Association Subcontractors of Mass., Inc. v. University of Mass. Building Auth., 442 Mass. at 163 (subcontractors association had standing to challenge building authority’s process for awarding public construction project where competitive bidding statute allowed private party to bring suit to enforce its provisions). Cf. Enos v. Secretary of Envtl. Affairs, 432 Mass. at 139 (property owners in Plymouth did not have standing to challenge Secretary of Environmental Affairs’ issuance of certificate of compliance for sewage treatment plant where statutory scheme of MEPA allowed citizens to participate in hearing process but did not provide mechanism for challenging certificate of compliance). Accordingly, the BPPA has representational standing to sue on behalf of its members because the interests the BPPA seeks to protect are germane to its organizational purpose, and neither the claim asserted nor the relief requested requires die participation of individual members in the suit. The BPPA’s complaint is not dismissible for lack of standing.[7]
C. Failure to Join Necessary Parties
The defendants further contend that the plaintiffs have failed to join all necessary parties in this action. Chapter 231 A, section 8 provides in relevant part:
When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.
The defendants argue that the 33 BMPD officers seeking transfer are necessary parties in this action. Although the BPPA is correct that those officers have no statutory right to a transfer under §35, it is inaccurate to say that they have no legal interest affected by this case. Those 33 BMPD officers have a direct stake in the determination of the validity of the proposed §35 transfer, because they will suffer the most immediate and irreparable harm if that transfer is denied or enjoined, in light of the Ciiy’s pronouncement that any officer not transferred by December 31 will be laid off. Given their direct interest in this litigation, and the potential prejudice to them of a decision rendered in their absence, the 33 BMPD officers seeking to transfer are indeed necessary parties to this action. See Gannon v. Mayor of Revere, 401 Mass. 232, 233 (1987) (noting that where individual police officer sought to compel mayor to make appointments to sergeant from eligible list, declaratory relief would be inappropriate in the absence of others with an interest in a declaration of rights and duties concerning the appointment of sergeants on the force). Cf. Attorney General v. Kenco Optics, Inc., 369 Mass. 412, 415 (1976) (not necessary to join parties whose only interest in a decision is that they might be bound by any precedent on an issue of law); Moskow v. Boston Redevelopment Auth., 349 Mass. 553, 561 (1965) (where property owner sued government agency challenging the validity of a taking of land for urban redevelopment, a bank which would benefit from the taking by becoming a tenant in the new building to be constructed was not a necessary party where the bank had no contractual right at stake and was in no different legal position from that of any other prospective tenant). Failure to join a necessary party is generally not an error sufficient to require- dismissal of the action. Stock v. Massachusetts Hosp. Sch., 392 Mass. 205, 214 (1984). See also Mass.R.Civ.P. 21 (misjoinder of parties is not ground for dismissal of an action). However, critical preliminary injunctive relief cannot be granted without the presence of these necessary parties.[8]
D. Primary Jurisdiction
Finally, the defendants contend that this Court is not the appropriate forum for this matter, citing the doctrine of primary jurisdiction. The doctrine of primary jurisdiction pertains when in the absence of pending administrative proceedings, a party invokes the jurisdiction of the court to decide the merits of a controversy which is within the special competence of an agency. Lincoln v. Personnel Adm’r of the Dept. of Personnel Admin., 432 Mass. 208, 211 n.4 (2000); Leahy v. Local 1526, 399 Mass. 341, 345-46 & n.3 (1987). This doctrine, which is exercised in the court’s discretion, does not divest the court of the power to hear cases; rather, it concerns the timing of the court’s involvement. Columbia Chiropractic Group, Inc. v. Trust Ins. Co., 430 Mass. 60, 62 (1999); Leahy v. Local 1526, 399 Mass. at 349. It guides the court in determining whether it should refrain from or postpone the exercise of its jurisdiction so that an agency may first answer some question presented. Leahy v. Local 1526, 399 Mass. at 350; Kartell v. Blue Shield of Massachusetts, Inc., 384 Mass. 409, 412 (1981).
The general rule is that the court must be careful not to invade the province of an administrative agency before it has commenced to exercise its authority in any particular case, because judicial interference would transfer to the courts a matter entrusted to the agency by the Legislature and result in the substitu *78 tion of the court’s judgment for that of the agency. Wilczewski v. Commissioner of the Dept. of Envtl. Quality Eng’g, 404 Mass. 787, 793 (1989). The doctrine of primary jurisdiction involves allowing completion of the administrative process before permitting judicial review in order to allow the agency a full and fair opportunity to apply its expertise to the statutory scheme it is charged with enforcing and to spare the judiciary the burden of reviewing administrative proceedings in piecemeal fashion. Walpole v. Secretary of the Executive Office of Envtl. Affairs, 405 Mass. 67, 72 (1989); Leahy v. Local 1526, 399 Mass. at 346.
The doctrine of primary jurisdiction applies to regulatory matters specifically entrusted to a particular agency and to matters involving technical questions of fact uniquely within agency expertise and experience. Columbia Chiropractic Group, Inc. v. Trust Ins. Co., 430 Mass. at 62; Weitzel v. Travelers Ins. Co., 417 Mass. 149, 152 (1994). Here, the Legislature has entrusted review of civil service matters to the Civil Service Commission (“the Commission") in the first instance. The statutory scheme empowers the Commission “to hear and decide appeals by a person aggrieved by any decision, action, or failure to act by the administrator” of the HRD. G.L.c. 31, §2(b). Moreover, the transfer provision at issue, §35, states that “[a] person who is aggrieved by a transfer . . . made pursuant to this section . . . may appeal to the commission pursuant to the provisions of section forty-three . . .” G.L.c. 31, §35. The BPPA is correct that the facts in this case are essentially undisputed, such that the Commission would not be required to exercise its expertise in finding the operative facts. See Leahy v. Local 1526, 399 Mass. at 350-51 (noting that absence of a dispute over the facts removes one of the principal reasons for the doctrine of primary jurisdiction). Nonetheless, the application of the statutoiy requirements of G.L.c. 31, §35 to the facts concerning the BMPD and BPD officers is the type of analysis within the Civil Service Commission’s expertise. Section 35 permits a transfer to a “similar” position in the same or in another departmental unit but, of critical importance to this case, states that “[a] position shall not be considered similar if it has a title higher than that of the position from which the transfer is to be made or if the requirements for appointment to such positions are substantially different.” G.L.c. 31, §35. The parties dispute the time frame contemplated by the statute in evaluating similarity, with the BPPA arguing that the requirements actually imposed on the putative transferees to get their positions with the BMPD must be substantially similar to the requirements to get a position with the BPD. In contrast, the defendants contend that the requirements now being imposed on the transferring officers are substantially similar to the requirements for original appointment to the BPD, such that the statute is satisfied. Resolution of this dispute is a matter properly within the experience, expertise, and discretion of theCommission.
This action involves other thorny statutoiy issues as well. For example, the BPPA disputes that the BMPD officers at issue are “permanent” employees for purposes of G.L.c. 31, §35 and challenges their acquisition of permanent status by operation of St. 1998, c. 282 and by virtue of the Commission’s October 27, 2006 decision, which is currently under appeal. To the extent the proposed transfer is an involuntary one under the first paragraph of §35, the BPPA further contends that the BMPD officers are not “tenured employees” as that term is defined in G.L.c. 31, §1. All of these complicated statutoiy issues are within the unique expertise of the Commission.
This Court is not inclined to exercise its discretion to hear this matter in the first instance, thus substituting its judgment for that of the Commission. Rather, this Court is inclined to postpone the exercise of its jurisdiction to allow the Commission to first address the propriety of the proposed transfer, in accordance with the Legislative scheme for civil service matters. This Court acknowledges the BPPA’s argument that expeditious relief is virtually impossible to obtain from the Commission, given its limited resources.[9] However, this Court is optimistic that the Commission will expedite its review of this matter, given the importance of a timely decision.
E. The Transfer Statute
Although the BPPA’s ability to demonstrate a likelihood of success on the merits of this action is severely impaired by the doctrine of primary jurisdiction and the absence of the BMPD officers as necessary parties, this Court will nonetheless examine briefly the merits of its statutoiy argument. Chapter 31, section 35 provides in relevant part;
a tenured employee may be transferred to a similar position in the same or in another departmental unit after request in writing for approval of such transfer made to the administrator by the appointing authority or authorities for such unit or units and with the approval of the administrator, provided such request includes reasons which, in the opinion of the administrator, are sound and sufficient to show that the transfer will be for the public good and will not impose unreasonable hardship of such employee. A position shall not be considered similar if it has a title higher than that of the position from which the transfer is to be made or if the requirements for appointment to such positions are substantially different. (Emphasis added.)
This paragraph appears to contemplate an involuntary transfer initiated by the appointing authority. The final paragraph of §35 further provides;
*79 Any permanent employee in a departmental unit may apply in writing to his appointing authority for transfer to a similar position within such unit, or may apply in writing to the appointing authorities for such unit and for any other departmental unit for transfer to a similar position in such other departmental unit. With the written consent of such appointing authority or authorities, as the case may be, and with the written consent of the administrator, such person may be so transferred. (Emphasis added.)
This paragraph appears to contemplate a voluntary transfer initiated by the employee himself. As of the date of this opinion, it is unclear whether the intended transfer of the 33 BMPD officers to the BPD will proceed under the first paragraph of §35, the last paragraph, or both simultaneously.
The BPPA contends that the proposed transfer is improper under G.L.c. 31, §35 because the requirements for appointment to the respective positions are substantially different, with the result that BPD officer is not a “similar position” to BMPD patrol officer within the meaning of the statute. The evidence in this case reveals that BPD officers are appointed under Chapter 31 after passing a competitive civil service exam and passing a thorough psychological, medical, and background screening. BPD officers then must complete a 28-week Boston Police Academy training, followed by a one-year probationary period as a patrol officer pursuant to G.L.c. 31, §34. In contrast, almost three-quarters of the current BMPD officers were hired prior to 1997, when only an informal application and interview hiring process was used. Those individuals were not required to take any type of examination to be appointed as a BMPD patrol officer. The remainder of the current BMPD officers were appointed after passing a non-civil service examination to become a site officer and then were promoted to patrol officer based on past performance, physical aptitude, attendance, and completion of 16 weeks of police academy training and 45 days of field training, with no separate probation period. Their appointment was made by a civilian property manager with no background in law enforcement. Assuming that the Civil Service Commission would interpret the statutory phrase “requirements for appointment to such positions” to refer to the requirements imposed in order to obtain a job as a BMPD officer in the first instance, it appears that the BPPA has a strong argument that the proposed transfer would violate G.L.c. 31, §35 because the two positions at issue are not “similar.” See Goncalves v. Boston, 66 Mass.App.Ct. 187, 185-86 n. 11 (2006) (noting that although the duties of BMPD and BPD officers are “comparable in many respects,” they are two distinct forces with historically different hiring processes).
Moreover, the BPPA has a strong argument that the statutory requirement that the positions be “similar” in the sense that the requirements for appointment not be substantially different applies regardless of whether the transfer occurs under the first or last paragraph of §35. This Court is not persuaded by the City’s argument that the Legislature’s failure to repeat the first paragraph’s specific definition of “similar” in the final paragraph evidences its intent that the word “similar” be given its ordinary meaning in the context of voluntary transfers, with the result that a voluntary transfer should be approved unless it is inconsistent with the purposes of the civil service law. The absence of a definition of “similar” in the voluntary transfer paragraph is arguably unnecessary, given the explicit definition in the first paragraph. A reasonable interpretation of the statute is that the definition of “similar” in the first paragraph applies to the last paragraph as well.[10]
Nonetheless, in weighing the plaintiffs’ request for an injunction, this Court must consider not only the apparent strength of the asserted statutory argument, but also the absence of necessary parties to the in-junctive relief and the propriety of any judicial relief at this time under the doctrine of primary exhaustion. In light of these serious impediments, the BPPA has not met its burden of demonstrating a likelihood of success on the merits of this action.[11]
II. BALANCE OF THE HARM
Given that this is a suit brought to enforce G.L.c. 31, §35 and the civil service policies enacted by the Legislature, this Court must determine whether the requested injunction promotes the public interest or alternatively, that the equitable relief will not adversely affect the public. Local Order of Moose, Inc., Yarmouth Lodge #2270 v. Board of Health of Yarmouth, 439 Mass. 597, 601 (2003); LeClair v. Town of Norwell, 430 Mass. at 332. Where a statutory violation is alleged, the court should consider how such violations affect the public interest, keeping in mind the express purposes of the violated statute. LeClair v. Town of Norwell, 430 Mass. at 332, 337; Edwards v. Boston, 408 Mass. 643, 647 (1990). The purpose of the civil service system is to guard against political considerations, favoritism, and bias in government employment decisions and to foster the selection of public employees of skill and integrity. Massachusetts Assoc. of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 259 (2001); Cambridge v. Civil Service Comm’n, 43 Mass.App.Ct. 300, 305, rev. den., 426 Mass. 1102 (1997). The requirement of §35 that a transfer be to a “similar position” furthers these purposes. Given the' plaintiffs’ strong argument that the positions of BMPD patrol officer and BPD officer are not “similar” within the meaning of the statute, an injunction would protect the public against the inherent harm occasioned by a violation of the civil service laws. In *80 addition, the City will spend $10,000 per officer to effectuate the transfer, money that cannot be recouped by taxpayers should the transfer later be deemedimproper.
However, this Court is not persuaded by the plaintiffs’ arguments that the safely of the public will be harmed by the proposed transfer. The BPPA argues that the transfer of BMPD officers into the ranks of the BPD will threaten the safely of both its members and the public because the BMPD officers have inferior credentials and training. Based on the evidence before this Court, however, it appears that the Ciiy has carefully screened the applicants for transfer and has instituted appropriate procedures to ensure that they are properly trained before they become BPD officers. As a practical matter, any transferred officers will not be on the streets as BPD officers for several months, by which time HRD and the Civil Service Commission, it is respectfully urged, should have determined the propriety of their transfer. In addition, the City has advanced a strong argument that an injunction preventing the transfer will harm the public interest, given the need for more BPD officers and the careful screening and training procedures in place for the transfer.
Irrespective of the weight this Court might ultimately assign to each of these considerations in balancing the harm, injunctive relief is not appropriate because the BPPA cannot demonstrate a likelihood of success on the merits of this action at this time in light of the doctrine of primary jurisdiction and the absence of the BMPD officers as necessary parties. As discussed supra, those officers stand to be immediately and irreparably harmed by the issuance of an injunction in this case. That very fact underscores the mandate that they be joined as necessary parties to this action before any injunc-tive relief is granted. Moreover, this Court is persuaded that the Civil Service Commission, not this Court, should exercise primary jurisdiction in this matter. Accordingly, the BPPA’s motion for a preliminary injunction must be denied.
In the interests of justice and judicial economy, this Court believes that this matter should be consolidated with the pending BPPA appeal of the Civil Service Commission’s October 27, 2006 decision, given the common question of law concerning the validity of Civil Service Commission’s action in granting certain BMPD officers permanent civil service status. See Mass.R.Civ.P. 42(a).
ORDER
For the foregoing reasons, it is hereby ORDERED that the plaintiffs’ motion for a preliminary injunction be DENIED. It is further ORDERED that this case be consolidated with Suffolk Superior Court Civil Action No. 06-4617-A, Boston Police Patrolmen’s Association v. Massachusetts Civil Service Commission.

The facts set forth in this portion of the opinion are drawn from the affidavits and other exhibits submitted by the parties and, to a limited extent, from oral representations made by counsel at a hearing on December 15, 2006.

As will be discussed in detail infra, Chapter 31, Section 35 permits an appointing authority to request, with the approval of HRD, the transfer of a tenured employee into a similar position in the same or in another departmental unit. It also permits a permanent employee to request, subject to the consent of the appointing authority and HRD, transfer into a similar position in the same or in another departmental unit.

Because of their date of hire, these officers were not made permanent by operation of St. 1998, c. 282.

Boston Police Patrolmen’s Association, Inc. v. Massachusetts Civil Service Commission, Suffolk Superior Court Civil Action No. 06-4617-A.

Notably, the BPPA was allowed to intervene in the action before the Civil Service Commission in which approximately 20 BMPD police officers sought permanent status, because the Commission concluded that “the Association may be substantially and specifically affected by the outcome of this proceeding, albeit indirectly.” In addition, in a 1999 case before the Civil Service Commission, the BPPA was allowed to seek direct review of the personnel administrator’s action or inaction regarding the work performed by BMPD police officers, essentially challenging the status and functions of BMPD officers.

Although the Boston Municipal Police Patrolmen’s Association has been permitted to intervene in this action, the individual BMPD officers must be given the opportunity to obtain private counsel to represent their interests, if they so desire.

According to a review of the ten most recent Civil Service Commission decisions by Attorney Biyan Decker, the Commission took an average of 23.4 months after the date of filing to issue a decision.

This Court notes the City’s further argument that the third paragraph of §35, which governs transfers within executive offices, states that it is “otherwise subject to the requirements of the two preceding paragraphs,” thus incorporating by reference the first paragraph’s definition of “similar.” The City argues that the absence of such an incorporation in the final paragraph of §35 supports its argument that the statutory definition of “similar” does not apply to voluntary transfers. While this Court is not persuaded by that argument, such statutory nuances are for the Civil Service Commission to unravel in the first instance.

The parties did not raise at oral argument the substance of Count II of the complaint, the action under the ten taxpayers’ statute. However, this Court notes that the ultimate issue in that cause of action is the legality of the proposed transfer. Accordingly, nothing raised by that cause of action affects the Court’s conclusions.